In re Janitor of Supreme Court.

[April 15, 1874.]

## In the Matter of the Appointment and Removal of the JANITOR OF THE SUPREME COURT

*Right of court to appoint its own janitor.   Control of rooms in the state capitol.*

1. It is a power inherent in every court of record, and especially one of last resort, to appoint necessary assistants charged with the care of its rooms, and other like functions; and the court itself is to judge of the necessity; and it is doubtful whether the court could be deprived of this power by an act of the legislature.
2. Under secs. 13, 14, ch. 10, R. S., *it seems* that the rooms in the state capitol occupied and used by the state officers, including the rooms of the justices and officers of the supreme court, are subject to the exclusive control of the officers occupying them; and that the superintendent of public property has no authority to interfere with or control such rooms, and can send workmen to clean, repair or improve them only at the request or with the consent of the officers to whose use they are appropriated.
3. The power to remove or appoint the *janitor* of the supreme court is possessed *by the court*; and an order of the superintendent of public property purporting to remove a janitor previously appointed by the court, is held *void*.
4. Should the superintendent of public property omit from the pay-roll the name of the janitor so holding by appointment of the court, so that his compensation cannot be paid to him monthly as heretofore, and should the legislature neglect to make the requisite appropriation for the pay of such janitor, the latter will have his remedy by action against the state in the manner prescribed by law.

DIXON, C. J.   On the second day of April instant, the state superintendent of public property, by an order in writing officially subscribed and addressed to the "janitor of the supreme court," and served upon the individual occupying that position, attempted to remove the person so served from his place.   The order seems to have been made upon the supposition on the part of the superintendent that he was clothed with full power and authority to appoint and remove the janitor of

this court at his mere will or pleasure, and it was followed by the immediate appointment in form of another person, a total stranger to the members of the court, to serve in the place of the janitor so attempted to be removed. The order was peremptory in its character, made without cause, and without claim or suggestion of disqualification or misconduct of any kind on the part of the janitor removed. It was a wholly arbitrary order, issued in the exercise of a supposed unlimited power possessed by the officer making it. It was made without consulting the justices, or any of them, of this court, or any officer of the court whose assistant the person removed was, and without any previous information or intimation to them or any of them that any change in the public service in that particular was contemplated or thought desirable by the state superintendent of public property. The appointment of a successor was in like manner made without taking the advice and regardless of the wishes, inclinations or convenience of the justices of the court and other officers immediately and almost solely interested.

The janitor whose removal was thus ordered, was the appointee of this court, and as such had held the position for the period of about one year. The appointment was made just as that before it and the one before that had been, namely, by the justices of this court. The incumbent and his predecessors had been chosen and designated by the court or the justices, and never, so far as any justice now sitting has any remembrance or knowledge, has any janitor been appointed or removed except by the court or the justices or by and under their direction and with their consent and approval. No superintendent of public property has ever assumed to possess or attempted to exercise any arbitrary power of appointment or removal ; and the person designated by the court has never before been in any manner interfered with by any supposed outside authority whatever. The practice on appointment has invariably been for the justices to examine and consider the character and qual-

ifications of the applicant with respect to the service; and when these were found satisfactory and sufficient, the justices have made selection, and the name of the person selected has been entered by the superintendent upon the pay-roll of workmen about the capitol, and in that way the appointee has been compensated for his services at day's wages paid to him the same as other day laborers in and about the capitol building and public grounds.

In some respects the services rendered by the janitor are peculiar, and such as can not be readily or well, if at all, performed by a stranger. Aside from keeping the court room, library and consultation rooms, and offices of the reporter and clerk, in neatness and order, they partake in nothing of the character of the labor done by the workmen in the employment of the superintendent for the state. They may be looked upon in some particulars as the services of a skilled laborer. No person, for example, but one of some education and of considerable experience, and who is also particularly careful and attentive, is fitted to perform the services of the janitor in and about the library, to bring, for the use of the members of the bar and the justices of the court, books from, and restore the same to their proper places on the shelves. The library, the volumes in which are being increased at the rate of two hundred or over per annum, already consists of about twelve thousand different books, upwards of six thousand of which are law books proper, or elementary treatises on the law and reports of decided cases and judgments pronounced by courts. These law books are, in constant use throughout the year, either by the court and bar in term or by the justices in vacation; and every day some or other of them, in numbers large or small, must be taken from the library to the court room, or from the library to the consultation room and working office of the justices, and thence in due time back again to the library, and there distributed and replaced in proper order upon the shelves, each book to the identical space set apart

for it and in which it belongs. Every person in any way familiar with the course of business in the court and the labors of the justices in the consultation room, knows how constant and unending this use of books from the library is. Every person accustomed to the use of books in so large a library, and to whom they may be said to be the tools with which he performs his daily labor, knows and appreciates the necessity for the most orderly and systematic arrangement of the books, and with what care and precision such arrangement should be observed and maintained. Every person so accustomed and so laboring has at some time probably experienced the confusion, delay and annoyance resulting from the misplacement of a single book. Accidents of the kind will sometimes happen even with the most careful and experienced assistants, and instances have occurred with this library, where a misplaced book, supposed to be lost, has only been found after the lapse of several weeks or even months. A library, no matter how large, to one in the daily habit of using its books or whose daily duty is to take the books from and restore them to their accustomed places on the shelves, and who learns to know and distinguish them by their titles, numbers and external appearance, becomes after a time so thoroughly mapped and delineated on the mind, that, instinctively or as by a kind of natural impulse, the books are taken from and returned to their appropriate places with a certainty that seldom or never errs. Persons so habituated and familiarized will not unfrequently be able to put their hands upon a particular book without the aid of sight or when everything is dark and invisible about them. Familiarity or experience of this kind is invaluable in the janitor or assistant of this court; for though it is usual for the justices to repair to the library in quest of and to obtain such books as they need, the janitor is depended on exclusively to replace the books upon the shelves; whilst for the members of the bar and others not well acquainted with the library, and during the sessions of the court and at other times, he invariably per-

forms both services.    In such cases he brings the books upon request, and, when the proper time arrives, returns them to their places ; and at all times, for the justices of the court as well as others, when a book is not found in its proper place, it is his duty and he is expected to search for and bring it.    With the great labors devolving upon the justices of this court, and which they endeavor to perform as best they can, the services of a person so habituated and familiar are indispensable.    The administration of justice cannot well or conveniently be proceeded with without the aid of some such assistant.    Experience has demonstrated in the cases of past appointees that persons of the class usually applying for or who are willing to accept positions of the kind at ordinary laborer's wages, require from three to six months' time before becoming well versed in these duties, or before they can be said to be in any way thoroughly useful and efficient.    For the first three months the uninitiated is practically useless in this branch of his duties, while after that he becomes constantly more and more useful according as he has had more and more practice and experience.    Even a gentleman of liberal pursuits and a member of the legal profession, who has acquired much knowledge of books and is presumed to be especially familiar with those pertaining to the law, would, if conducted into the library for the first time, need the experience of some weeks before obtaining the knowledge and familiarity respecting the books possessed by the practiced janitor, and so as to be able to answer, as the janitor could, an inquiry made, whether a particular book was contained in the library or not.    Some weeks ago the present librarian found it necessary, in order to accommodate the room to new books already received and soon to arrive, to change the arrangement of the books throughout, or nearly so, which changes were made and the books rearranged by the janitor or with his assistance, as was his duty, under the direction of the librarian ; and since that time the justices of this court have been and still are almost as strangers in the

library. They have been obliged again and again, and still are under the frequent necessity of calling to their assistance the janitor in order to find books when wanted. The janitor here spoken of is the same whose removal was ordered in the manner above stated, and who is an experienced, intelligent, competent, faithful and most unobtrusive and obliging assistant, of whose services the members of this court cannot easily or without very considerable inconvenience and trouble be deprived.

Another consideration, and by no means a slight one, entering into the employment or service in question, is the relation of trust and confidence existing between the members of the court and the person engaged in the position of janitor. In all the affairs and transactions of life, even down to those which are strictly private and domestic in their nature, where the services or agency of others are necessary, the fiduciary or confidential relation, more or less clearly marked and defined, and constituting in part the consideration of the engagement and the value of the services, between employer and employed, or master and servant, is well known, and its existence recognized and respected. This principle of trust and confidence pervading every department of active life, both public and private, the law also recognizes and acts upon and will enforce and protect. As already observed, it is a principle which finds its way into the employment or service in question, and as such it is entitled to some consideration and respect.

The justices of this court, assigned to permanent quarters or rooms set apart for their use in the capitol building, and in which they spend all the working hours of their judicial lives in constant and most unremitting mental toil and labor, ought at least and under any circumstances, as they think, to be consulted with respect to the character and qualifications of their assistant, who, though in a subordinate or inferior capacity it may be, is to be always present at their command to give aid and relief by his manual labors. In the appointment of jani-

tors heretofore much attention has been paid to the character and habits of the applicant, and to ascertaining that he was a trustworthy person. In his capacity as assistant having charge of the rooms and the furniture and seeing that they are kept in neatness and order, he has daily access to the desks of the justices, in which are always to be found opinions, papers, documents and other things of importance and value, and as to which strict noninterference or secrecy is to be maintained. He is in a position to observe and to learn many things of an official nature which ought not to be spoken of, and which the interests of the public and of suitors and the ends of justice positively require should not be. An' over-curious and obtrusive and at the same time garrulous, leaky or corrupt assistant, would be the source of the greatest public disorder and mischief. Hence it is that the relations between the members of the court and the janitor are and of necessity must be to a considerable extent confidential; and hence also the necessity and propriety of consulting them, and of the exercise of some care and caution on their part in the selection of a discreet, trustworthy and honest assistant. The good of the public service imperatively demands this, and the justices of this court would be derelict in the performance of their solemn duty if they failed in its enforcement. The assistant whose dismissal was ordered, has been tried and not found unfitted in these particulars; and it is the desire and intention of the justices to retain him in the public service, if possible.

The considerations above stated, and which influence or should influence so largely the removal or appointment, sufficiently show why in any case no removal should be ordered or appointment made without the advice and approbation of the justices. But it is not of the manner of the removal or appointment, as an act within the discretion of the superintendent of public property, or one which he had the unqualified power to do, that the justices of this court complain. Conceding the discretion or power as stated, the justices composing the bench

would never be found sitting in judgment upon a mere question of etiquette, or of those observances which are supposed to prevail and be regarded in official life, and especially in the communications and interchanges which take place between the officers of different and independent or coördinate departments of the government. It is of no act of official discourtesy or any violation of that outward respect and deference which the rules of official intercourse prescribe, that the members of the court complain ; for they freely acquit the superintendent of any such purpose. The power to make the order conceded, the court does not sit to take exception to the manner of its exercise, or to say that it was rude and unceremonious ; for though it may seem that, we are content to believe it was never so intended. Enough has already been said to show that the appointment should be made as has heretofore been the custom; and that the power of appointment according to that custom should reside in the court; and it is the object of this opinion to vindicate the power and to defend and uphold the prerogative and independence of the court as they are believed to exist in the particulars under consideration. The power of removal, there being no other provision, follows and abides with the power of appointment; and if the court or the justices possess the latter, it follows that they alone can exercise the former. The order of removal is objected to and resisted for want of authority in the officer making it, and as a direct invasion of the rights and privileges of the court and of the justices. It is objected to as an act of usurpation and not of legal authority. It is manifest, if any such power, arbitrary in its nature and uncontrolled in its exercise, exists outside of the court or the justices, and in some executive or political officer, that very serious embarrassments and great inconvenience and trouble must sometimes ensue to the justices and others from the changes and removals which might be made. Such would be the condition of matters now, should the change at present attempted be acquiesced in. It would be impossible to foresee when or how often such

changes would be made, and they might be rendered intolerable by their very frequency. If often made, and the appointing officer might remove as often as he pleased, the services would in a great measure be lost. Incompetent persons, or such as were incapable of becoming efficient and useful, or those who were morally or physically disqualified, might be sent, and yet there would be no help or deliverance except at the will of the appointing officer. The right of petition or entreaty, or of protest or expostulation, might exist on the part of the justices, but the appointing officer might remove or not as best suited his own mere pleasure. He might send a blind or a deaf man, or one wholly illiterate, or not speaking our language, or a person unfitted in character or habits, and still there could be no relief but as he was inclined to give it. It is of course not claimed that any such appointment has been made or is likely to be; but these serve as illustrations of the nature and extent of the power, if any outside officer possesses it. The person appointed, or attempted to be, by the superintendent, may be and quite probably is, in no respect exceptionable, save only that he is new and altogether unused to the business, and will require considerable time to learn; but if he was incompetent or disqualified in any of the ways above specified, the result of the appointment, supposing it to have been made by authority, must have been the very same. The justices of the court must have submitted to the disqualifications or incompetency until relief was condescendingly granted by the officer making the appointment. To avoid all difficulty and to preserve that harmony and good feeling which ought to exist, application has been most respectfully made on the part of this court to the superintendent to withdraw his interference and to permit the service to remain as it was, and the application has been refused.

Fortunately for the members of the court and for the public service in which they are engaged, they are left in no such attitude of humiliation as compels them to petition the superin

tendent, or any other administrative or executive officer, to redress the wrong; nor are they obliged to suffer the inconveniences and trouble which must flow from it if not so redressed. It is a power inherent in every court of record, and especially courts of last resort, to appoint such assistants; and the court itself is to judge of the necessity. This principle is well settled and familiar, and the power so essential to the expedition and proper conducting of judicial business, that it may be looked upon as very doubtful whether the court can be deprived of it. As a power judicial and not executive or legislative in its nature, and one lodged in a co-ordinate branch of the government separated and independent in its sphere of action from the other branches, it seems to be under the protection of the constitution, and therefore a power which cannot be taken from the court, and given to either the executive or legislative departments, or to any officer of either of those departments. But, however these questions may be, no attempt has ever been made to deprive the court of the power thus inherently possessed by it; and the authority of the superintendent of public property in or about the rooms and offices occupied by the court and its officers will be found extremely limited, if indeed he can be said to have any control over them whatever. The authority of the superintendent, such as he has, is contained in secs. 13 and 14, ch. 10, R. S., which sections are repeated as secs. 3 and 4, ch. 27, and read as follows: "Section 13. The superintendent of public property shall have charge of the capitol, and public grounds around the same, and of all movable property belonging to the state, not already by law in charge of other officers: *provided*, that nothing herein contained shall authorize the said superintendent of public property to interfere with any rooms in the capitol that now are, or hereafter may be, appropriated by law for the use of the legislature or state officers, during the time the same shall be used and occupied." "Section 14. The superintendent of public property is hereby authorized to employ such workmen in and about the

capitol and public grounds as may be necessary to keep the same in a proper state of cleanliness and repair, and to make such improvements as may, from time to time, be authorized by law; he shall also perform such other services as now or hereafter shall be required of him by law."

It is thus seen that the superintendent is prohibited by statute from interfering with any of the rooms occupied by the state officers, which undoubtedly includes the rooms of the justices and officers of the supreme court; and, as those rooms are in constant use and occupation by the justices and officers, the time never comes when he is authorized to interfere. It cannot be said, therefore, that he has any control over them, unless incidentally, it may be, under the clause authorizing him to employ such workmen in and about the capitol and public grounds as may be necessary to keep the same in a proper state of cleanliness and repair, and to make improvements, etc. Whether the authority thus conferred is to be construed as a repeal *pro tanto* of the previous provision prohibiting any interference with rooms actually occupied, and so as to justify the sending or entrance of workmen and servants into the room to clean or repair against the will or without the consent of the occupants, is, to say the least, a point of some doubt. The object of the prohibition against interference seems to have been to leave the rooms actually used and occupied in the undisturbed possession, and subject to the exclusive control, of the officers occupying them; and this was an object very necessary and proper to be provided for and secured. Without such possession and control, the officers might be subjected to the most serious annoyances and interruptions in the transaction of business. In view of this necessary and important object, therefore, the provision respecting the employment of workmen to clean and repair may be regarded as subordinate, and not intended to infringe or limit the effect of the prior provision forbidding interference with occupied rooms. Ample scope is given for the operation of the clause respecting clean-

ing, repairing and making improvements, when workmen are permitted to enter occupied rooms for those purposes at the request or with the consent of the occupants, and when likewise it is considered that the halls, rotunda and various rooms within the capitol and grounds about it, are always more or less unoccupied, and always requiring some such labor and attention. No one would contend, for example, that workmen could be sent to the court room to sweep or dust or make repairs while the court was in session, nor to any other room for the like purposes against the wishes of the occupant. The work of keeping the various rooms occupied by the court and its officers in cleanliness and order has always devolved upon the janitor, and is one of his duties; and it has not been the subject of remark that the same has not been well and satisfactorily done. It is not perceived, therefore, how the superintendent can interfere, or by what authority he interposes to regulate or con· trol the rooms contrary to the directions of the justices of the court occupying them and for whose use they are set apart.

The conclusion of the court therefore is, and it so holds and decides, that the power to remove or appoint the janitor is possessed by the court, and that the supposed order of removal made by the superintendent is void. The janitor, *Christian Henry Beyler*, heretofore appointed, must therefore be retained until the further order of the court or the justices, or until he shall voluntarily decline to further serve in that capacity; and, until otherwise in like manner ordered, his compensation will remain the same as has heretofore been paid by the state for the same services. In case his name shall be omitted by the superintendent from the pay-roll, so that his compensation cannot be made to him monthly as heretofore, it will devolve upon the next legislature to make the requisite appropriation and likewise to provide against the recurrence of similar contingencies in the future. It is not within the range of presumption, or a supposition to be for a moment indulged, that any legislative body will neglect or refuse to make such ap-

propriation or to enact suitable measures for the future; but if it should refuse to appropriate, the appointee will have his remedy by action against the state in the manner prescribed by law.

We fully concur in the views of the chief justice as contained in the above opinion.

COLE, J.
LYON, J.