## In re Surcharge of County Commissioners.

*George Morrow*, for appellants; *Taylor & Lewis*, for county commissioners.

MAXEY, J.—The opinion filed in the above-entitled case, purporting to be filed "By the Court" and signed "Newcomb, P. J.," does not represent the opinion of the Court of Common Pleas of this county, and the judgment entered for $1894.19 against Morgan Thomas et al., as a surcharge, upon the direction of said judge in said opinion, without the concurrence of at least one of the other judges of the Court of Common Pleas of this County, is a nullity. It is merely a one-judge order. This case was never argued before the court *in banc* and was not discussed by the court *in banc*. In fact, this case was never discussed by Newcomb, P. J., with, or mentioned by him to, the writer of this opinion, although we have at all times been available for conference.

In his opinion attempting to dispose of this case, Judge Newcomb wrote as follows: "For obvious reasons it is no welcome duty to have to sit in judgment in such case. But it is here and the right of the parties to have it disposed of cannot be denied."

If the duty to dispose of this case was as "unwelcome" as the quoted words would indicate, Judge Newcomb could easily have divested himself of part of this burden by giving his colleagues an opportunity to share it with him. However, he did not do this. We may with propriety add to the latter's statement above quoted, so that it will read as follows: "The right of the parties to have this case disposed of *by the entire court in banc* cannot be denied."

In the very recent Scranton registration case, Nolan *v.* Farr, No. 15, November Term, 1928, in Equity; No. 111, January Term, 929, Supreme Court; in an opinion reversing an order made by Newcomb, P. J., in the name of the court, without consulting his colleagues, the Supreme Court said, quoting a statute: " 'Any person . . . may appeal to the Court of Common Pleas,' . . . in which event the matter should be heard as the act specifies by the 'Court of Common Pleas' sitting *in banc*, and not by any one judge thereof, if other judges are available for the purpose."

The appeal of this case is from the report of the county controller to the "Court of Common Pleas:" Act of June 12, 1878, P. L. 208. This appeal must, as the Supreme Court said, "be heard as the act specifies by the 'Court of Common Pleas' sitting *in banc*, and not by any one judge thereof, if other judges are available for the purpose."

The Supreme Court, in Summers *v.* Kramer, 271 Pa. 189, in which it held that in a district in which there were two judges of the Court of Common Pleas, the judgment of one of the judges of the court entered without the concurrence of the other judge was no judgment at all, said, in an opinion by Justice Simpson, page 195: "There is no judgment to affirm. It requires the

action of a majority of the court to authorize the entry of a judgment; no one judge can enter it against the protest of his only colleague, who has an equal right to pass on all matters pending in the court: Madlem's' Appeal, 103 Pa. 584; Butts *v.* Armor, 164 Pa. 73; Myers *v.* Consumers' Coal Co., 212 Pa. 193. . . . 'What is ordered and adjudged by the court, not merely what is entered, constitutes the judgment:' Butts *v.* Armor, *supra.* . . . As Bach (judge) had equal power and authority in the court, neither had a legal right to exclude the other from participation in its business."

In Myers *v.* Consumers' Coal Co., 212 Pa. 193, the Supreme Court, in an opinion by Mestrezat, J., said, page 200: "Luzerne County is a separate judicial district and elects four judges learned in the law who sit in and compose the Court of Common Pleas of that county. While there are four law judges of the Common Pleas of that county, there is but one court, and the concurrence of a majority of the judges is a prerequisite to the entering of a valid decree. . . . The court *in banc* should have heard the argument on the exceptions and, after consideration, should have disposed of the exceptions and entered a decree. There would then have been a decree of the court from which only an appeal lies."

Butts *v.* Armor, 164 Pa. 73, Dean, J., page 83, said:

"A court is a 'tribunal established for the public administration of justice and composed of one or more judges, who sit for that purpose at fixed times and places, attended by proper officers:' Burrill's Law Dictionary; Mason *v.* Woerner, 18 Mo. 570. . . .

"The court which took cognizance of this cause at the trial was composed of the three judges, . . . and they sat at the time and place appointed by law for that purpose. Then, after adjournment, they commenced to act, not as a court in consultation over a grave question involving both fact and law, but as individuals. Without consultation with the associates, the president judge . . . filed in vacation this opinion as the judgment of the court.

"The two associates thereupon, at no court of which the president judge was a member, and without consultation with him, overruled this judgment and filed one to the contrary. . . .

"After hearing a cause, opinions of the individual members of a court, no matter how diverse, may be expressed to and urged upon each other as reasons in vindication of a proposed judgment, and the opinion of one may be adopted as that of the court and judgment be entered accordingly. But if, after hearing, the members of the court, without consultation, deliberation or decision, separate and each one commences to file of record his individual opinion and conclusion, however valuable these may be as law literature, they are not judgments of a court. 'What is ordered and adjudged by the court, not merely what is entered, constitutes the judgment:' Freeman on Judgments, § 38.

"There never was, so far as this record shows, a Common Pleas Court held by the president in the absence of his associates at which his judgment, as the act of the court, was made up or entered; there never was a Common Pleas Court held by the two associates in the absence of the president for the adjudication of questions arising out of this trial. . . .

"Not one of these judgments was entered by the Court of Common Pleas; they were only the individual opinions of the members of that court, and all of them, as judgments, must for that reason be set aside."

In the recent case of Sterrett *v.* MacLean et al., 293 Pa. 557, reported in the Advance Reports of Nov. 9, 1928, the Supreme Court, in an opinion by Justice Frazer, said, page 563:

"We have consistently reprehended the allowance of proceedings in court before only one judge when the particular judicial district had two or more judges and where the vital interest of litigants or the conservation of public rights renders it imperative that a case be heard, considered and decided by aid of the experience and knowledge as well as the personal attention of more judges than one. . . .

"Since but one judge heard and determined the case, we consider that the court so constituted, to use the words of the Chief Justice in Com. v. Hall, 291 Pa. 341, 355, 'was not constituted as required by law and, therefore, lacked legal capacity—or, in that sense, jurisdiction—to adjudge the particular case before it.' On consideration and determination of any case in matters of review or appeal, the final obligation rests upon the court *in banc*, quite aside from the Act of 1876. This obligation is mostly adequately and fairly met when the largest number of judges available take part in the proceedings and for a proper disposition of the litigation at least two judges should be present when the bench consists of two judges, and if one is not available then a judge from another district should be called in to perform that service; while in districts where the bench has a greater number of judges, at least two must sit as the court *in banc*, and when it can be arranged without considerable inconvenience, three should sit. In the present case, the right of President Judge Rossiter to act for the whole court is challenged. The record does not show that the final decree was entered after consultation with the other judge of the district, and the plain intent of the Act of 1876 requires the attendance of more than one judge where the bench consists of more than one.

"Under these circumstances: The judgment is reversed. . . ."

1 Cooley's Constitutional Limitations (8th ed.), page 193: "A court must act as an organized body of judges, and where differences of opinion arise they can only decide by majorities."

### Facts discussed.

The appointment of Miss Amelia S. Koch by Judge Watson as secretary or clerk to assist him in the performance of his judicial duties was necessary to the due administration by Judge Watson of the duties of his office. This appointment was made by him after a conference with another judge of this court, who agreed with Judge Watson that the appointment of Miss Koch was necessary to the due administration by Judge Watson of the duties of his office. The action of Judge Watson in appointing Miss Koch was, therefore, the action of the Court of Common Pleas of this county, and it was so recognized by the county commissioners of this county. There was nothing secret or surreptitious about Miss Koch's appointment. While the fact of Miss Koch's appointment as clerk or stenographer by Judge Watson was noted in the public press and was well known to every member of the court of Lackawanna County, no judge of the court made the slightest objection or protest against the appointment of Miss Koch. Therefore, it might be said that this appointment was made not only by the express consent of one of the other judges but by the tacit consent of all the judges of the Court of Common Pleas of Lackawanna County and was to all intents and purposes, therefore, an appointment made by the Court of Common Pleas of Lackawanna County.

We think it would appear to the average mind, either professional or lay, that if any judge of this court believed that the county commissioners in obeying an order of one or more of the judges of the court were exceeding their statutory powers, the very least said judge could have done was to call the matter to the commissioners' attention and have steps taken to have the matter in question judicially determined by the entire court *in banc*.

Every judge of the Courts of Common Pleas of Pennsylvania, so far as we have been able to ascertain, has a court stenographer, or secretary, or clerk to assist him in the performance of his judicial duties, and the salary of this attendant is paid out of the respective county treasuries. For example, the judges of the Court of Common Pleas of the neighboring County of Luzerne and of the neighboring Counties of Bradford and Susquehanna and Monroe each have secretaries or clerks whose salary is paid by the treasury of the respective counties. Whether this attaché of the judge's office is called a clerk, or secretary, or court stenographer or assistant court stenographer, is quite immaterial. In Lackawanna County the President Judge of the Orphans' Court has an official stenographer who also attends to secretarial duties for the judge. The Court of Common Pleas of Lackawanna County has appointed three official stenographers. One of these stenographers, H. H. Coston, is in his eightieth year. It is no reflection on him to state that he is not as active and his services are not so easily available as they were years ago. One of these official stenographers, Daniel W. Williams, attends to his duties as court stenographer and when not engaged in court he is assigned to the office of Judge Maxey. He is also frequently called upon by Judge Newcomb and Judge Leach to do stenographic work for them in chambers. The other court stenographer, Willis D. Coston, attends to his duties in court and also does most of the stenographic work in chambers for Judge Newcomb.

When Judge Watson came on the bench he found there was no court stenographer available to him at the times that he most needed such services. In this county there are twenty-three weeks of common pleas and quarter sessions court and also five weeks of equity court in each year. There are also five sessions of divorce court and many hearings in court or in chambers on injunctions and *habeas corpus* proceedings. It frequently happens that several weeks each year are also taken up with hearings on election matters. All these proceedings require the time of the official court stenographers, with the result that the judge who is in chambers attempting to write opinions and attending to other judicial matters finds that there is no court stenographer available to assist him clerically and stenographically in the performance of his judicial duties. It was because of this fact that Judge Watson deemed it necessary to appoint a competent stenographer to assist him in chambers in the performance of his judicial duties. As the result of his recognition of this necessity, Miss Koch was appointed as his clerk and the county commissioners, upon being notified of this fact by Judge Watson, paid Miss Koch a salary of $150 per month. This salary did not completely pay for her services; Judge Watson personally out of his own private funds supplemented Miss Koch's salary to the extent of $50 per month additional.

It should be noted that while the record shows that Judge Watson's letter to the county commissioners is signed "Albert L. Watson," the original letter bore the abbreviation "A. L. J." (for "Additional Law Judge") and was written upon Judge Watson's official stationery.

Miss Koch not only rendered stenographic services to Judge Watson in his judicial capacity but on a few occasions did stenographic work for both Judge Newcomb and Judge Maxey. She took in shorthand and typewrote all the opinions of Judge Watson and attended to all his official correspondence. All the services that she rendered were rendered in behalf of the proper administration of justice in the County of Lackawanna. That the County of Lackawanna and not the county commissioners should pay for these services, every fair-minded person must concede.

No taxpayer or other official of Lackawanna County made any protest when Judge Watson, on March 30, 1926, appointed Miss Koch as clerk in his office, for the reasonable necessity for such appointment was obvious. It is a significant fact that the appointment was not even questioned until more than two years after the appointment was made, although the fact of the appointment was well known to the bench and to every person having business in the courts and to the newspaper readers of the county. There is ample ground for the belief so widespread in this county that the movement for these surcharges against the commissioners for the salary paid Miss Koch did not originate in the minds of the taxpayers who took the appeal from the controller's report. The circumstances surrounding this case brings irresistibly to one's mind the ancient incident in which "the voice" was "the voice of Jacob" but "the hand" was "the hand of Esau." But regardless of the source of that movement to surcharge the county commissioners, the question before the court is this:

### Question involved.

Has not a judge of the court, acting either alone or with the concurrence of another judge of the court, the right to appoint a clerk in his judicial office to assist him stenographically in the performance of his judicial duties?

### The law.

That courts have inherent power to do all things that are reasonably necessary for the proper administration of their office within the scope of their jurisdiction is a well-settled principle of law. This question was thoroughly and clearly and convincingly discussed by that distinguished jurist, the late John Lynch, President Judge of the Court of Common Pleas of the adjoining County of Luzerne, in an opinion filed by him in 1903, reported in Rosenthal v. Luzerne County, 11 Luzerne Legal Reg. Rep. 183, and 12 Dist. R. 738. The facts of this case were that one of the judges of the Court of Common Pleas of Luzerne County, acting in his official capacity and for the purpose of having his opinions in cases pending filed, employed a young woman to make typewritten copies of the opinions in forty-one cases which were before said judge for decision. The bill for these services amounted to $65. This young woman, also by appointment of said judge, acted as stenographer; she took and transcribed testimony in the juvenile court, for which she claimed $15. These charges were held to be reasonable. She presented her bill for $88 to the county commissioners and demanded payment, which was refused because the controller of said county refused to approve the stenographer's bill. Judge Lynch said in this case:

"These opinions were written for the purpose of giving the reasons of the court in the decisions entered in each case, and whilst written by one of the judges, they expressed the views of all the members of the court. They are in no sense the individual opinions of a judge and most certainly cannot be looked upon as in any way the private view of the person who wrote them. . . .

"This plaintiff founds her claim against the county, not as a county officer, but rather because in the discharge of the judicial duties of a judge, he, to expedite the affairs of the court and have the record of these opinions in a convenient and legible hand, deemed it his duty to employ her.

"Will it be said that the court, or a judge who has supervision of the courts, its records and its officers, must see the records of the court are properly kept, may employ or dismiss the officers, may see that the court-rooms are lighted, heated and kept clean and in order, has not the inherent power to employ and order paid the person who typewrites his opinions? Every bank, business

house, clerk of the courts, county commissioners and county controller has the services of such an one, and can it be said under the common law, which adjusts itself to the needs and advancement of the people, the judges of the court alone shall continue in the slow plodding methods of the past? It appears to me that the controller might with equal propriety refuse to approve bills for gas or electricity used for lighting the court-rooms or the judges' chambers and force a return to tallow dips, or refuse, as he did, to approve a bill for chairs purchased to take the place of worn out and rickety ones used by members of the bar in the court-room. . . .

"The law does not invest him (the controller) with authority to decide how or in what manner a judge shall discharge his judicial functions, and no judge who respects his high office, its power, honor and dignity, will submit to such assumption of authority. . . .

"In Lancaster County v. Brinthall, 29 Pa. 38, an action by a constable against the county for the recovery of costs for services rendered in criminal proceedings, it is said the duty to pay for such services arises from the benefit derived by the county from such services in the preservation of order and the administration of justice; and in McCalmont v. Allegheny County, 29 Pa. 417, the clerk of the Supreme Court having paid the expenses of providing apartments in which to keep and preserve the records and for incidental expenses of the court, although no act of assembly provided for such expenses, recovered the amount from the county.

"What was said by Gibson, C. J., in Commissioners v. Hall, 7 Watts, 290, may well be applied here; and in Allegheny County v. Watts, 3 Pa. 464, Gibson, C. J., speaking of a physician who testified as an expert before a coroner and who had sued the county for his services, said:

"'The service he performed, though ancillary to the purpose of the inquest, which could not have been effected without it, was not official and consequently not in the contemplation of the legislature in the framing of the fee bill; so that compensation for it is neither enjoined nor prohibited by that or any other statute. But though spontaneously rendered, both justice and policy require it to be paid for by the county if it was rendered at the public instance and request; that officer certainly has authority to pledge the responsibility of the county for the compensation of all ancillary services which are necessary to the proper execution of his office and which he could by no other means command.' . . .

"In Com. v. Commissioners of Philadelphia County, 2 S. & R. 195, Taylor sold chairs to the agents of the commissioners for the purpose of accommodating persons who were legally employed in holding an election. The objection was that the commissioners had no right to furnish chairs for the election. The court said: 'It (the election) ought not to be held without the conveniences which contribute to the ease and dispatch of a laborious business. It is held for the benefit of the people of the city and county, and, therefore, they ought to defray the expense.' . . .

"In Venango County v. Durban, 3 Grant, 66, the Supreme Court said: 'It is a mistake to suppose that the public have no interest in the trial of civil causes. . . . It ought to take the utmost care that justice be rendered to every one in the safest, the most speedy and the least burdensome manner. . . . Where no other provision is made for the necessary expenses of the judiciary in its official duties, the county where the court is held is in general liable.' . . .

"In Com. v. Magee, 8 Pa. 240, that 'the authority which a judge exercises at his chambers over process of the court in a case pending is that of the court itself and may be enforced by attachment.'

"We are of opinion that the necessity for expediting public business before the court for determination, the above decisions and the inherent power of the court fully justified the judge in having the opinions typewritten, and, therefore, judgment must be entered in favor of the plaintiff and against the defendant in the sum of $80.60, with interest from Jan. 12, 1903."

The appointment by Judge Watson of Miss Koch was based exactly upon the same grounds as the decision by President Judge Lynch, to wit, the necessity for expediting the public business before the court for determination.

7 Ruling Case Law, "Courts," § 62, page 1033, sets forth the following well-established principles: "It is fundamental that every court has inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction. . . . This power is essential to the existence of the court, for without it no court could possibly exist. The power of the court to order the repair of the court-room in which its sessions are held is akin to the power to punish for contempt, in that it springs out of absolute necessity; it does not belong to the general jurisdiction, but is incidental to such jurisdiction and is inherent in the court. Another illustration of the inherent powers of courts is the power to administer oaths in the trial of cases. . . . Likewise, a court has the inherent power and authority to incur and order paid all such expenses as are necessary for the holding of court and the administration of its duties. The difference between the jurisdiction of courts and their inherent powers is too important to be overlooked. In constitutional governments, their jurisdiction is conferred by the provisions of the constitution and of statutes enacted in the exercise of legislative authority. That, however, is not true with respect to such powers as are necessary to the orderly and efficient exercise of jurisdiction. Such powers, from both their nature and their ancient exercise, must be regarded as inherent. They do not depend upon express constitutional grant nor in any sense upon the legislative will."

7 Ruling Case Law, "Courts," § 12, page 985, sets forth, further: "To perform the functions of a court, the presence of the officers constituting the court is necessary. In addition to the judge or judges, the essential feature of all courts, and, in the case of courts of record, a recording officer, variously known as a clerk, prothonotary or register, numerous other officers are usually necessary to the existence of a court and the proper transaction of its business, such as sheriffs, constables, bailiffs, reporters, etc. . . . The power to appoint necessary attendants upon the court is inherent in the court in order to enable it to perform properly the duties delegated to it by the constitution, and it cannot be doubted that judicial power includes the authority to select persons whose services may be required in judicial proceedings or who may be required to act as the assistants of the judges in the performance of their judicial functions. . . . When it seems necessary to the judge of a circuit court that an attendant upon the court, in addition to the sheriff and his deputies, should be appointed, it is his right to make the appointment for such time as the necessity exists. . . . Whether the necessity exists must be determined by the judge of the court in which the appointment is made."

15 Corpus Juris, § 205, page 871: "The statutes frequently provide for the appointment by courts of court attendants or assistants, but even apart from statute a court of general jurisdiction, of record or of last resort possesses the inherent power to provide the necessary attendants and assistants as a means of conducting its business with reasonable dispatch or to provide for assistants charged with the care of its rooms or other like functions, and the court itself may determine the necessity: Nicholl v. Koster, 157 Calif. 416;

s. c., 108 Pac. Repr. 302; People *v.* Wendell, 57 Hun (N. Y.), 362; s. c., 10 N. Y. Supp. 587."

In a leading case arising in Wisconsin, the Supreme Court of that state held that even the legislature could not deprive the Supreme Court of that state of its right as a part of its inherent powers to appoint necessary assistants charged with the care of its rooms and other like functions, that the court itself was to judge of the necessity, that the power to remove or appoint the janitor of the Supreme Court was possessed only by that court, and that an order of the superintendent of public property purporting to remove a janitor previously appointed by the court was void. The Supreme Court in its opinion said, page 417, case In re Janitor of Supreme Court, 35 Wis. 410, 417: "The appointment should be made as has heretofore been the custom, and . . . the power of appointment according to that custom should reside in the court; and it is the object of this opinion to vindicate the power and to defend and uphold the prerogative and independence of the courts as they are believed to exist in the particulars under consideration. . . (page 419). It is a power inherent in every court of record, and especially courts of last resort, to appoint such assistants; and the court itself is to judge of the necessity. This principle is well settled and familiar and the power so essential to the expedition and proper conducting of judicial business that it may be looked upon as very doubtful whether the court can be deprived of it. As a power judicial and not executive or legislative in its nature and one lodged in a co-ordinate branch of the government separated and independent in its sphere of action from the other branches, it seems to be under the protection of the Constitution, and, therefore, a power which cannot be taken from the court and given to either the executive or legislative departments or to any officer of either of those departments. But, however these questions may be, no attempt has ever been made to deprive the court of the power thus inherently possessed by it; and the authority of the superintendent of public property in or about the rooms and offices occupied by the court and its officers will be found extremely limited, if indeed he can be said to have any control over them whatever."

The Court of Common Pleas of Lackawanna County sixteen years ago took a position exactly identical with that of the Supreme Court of Wisconsin, when an attempt was made by the County Commissioners of Lackawanna County to appoint persons to the position of janitor of the court-rooms. The Court of Common Pleas stood upon its right to name these janitors. The case was referred to Hon. A. T. Searle, P. J., of the neighboring County of Wayne, specially presiding. He held that this power to appoint janitors was inherent in the court and that the commissioners had no control whatsoever over these appointments. We cannot quote the opinion filed in this case because it was not reported in the Lackawanna Jurist and the opinion is missing from the files of the prothonotary's office. It was filed to No. 769, March Term, 1912. A writ of mandamus was issued requiring the county commissioners to pay these janitors appointed by the court.

*Examples of the exercise by courts of their inherent powers:*

Many examples could be cited of public expense incurred by order of courts in the exercise of their inherent powers and without specific statutory authority. Among the examples of expense incurred by orders thus made are the following:

*(a)* The feeding and lodging of jurors at public expense.

*(b)* The attendance of physicians upon jurors who became ill while impaneled. We had a recent example of this in Lackawanna County.

Commissioners *v.* Hall, 7 Watts, 290, Gibson, C. J., page 291: The expenditure for the accommodation of jurors "is as much a part of the contingent expenses of the court as is the price of the firewood and candles consumed in the court-room. A physician would scarce be thought to render, on the credit of the patient, professional services ordered by the court for a juror suddenly ill, when the object is not his private benefit but to serve the ends of public justice by repairing a disordered part of the judicial machinery. . . . In every aspect, we perceive emergencies which require the prompt and efficient action of the court, the safeguard of the public purse being found in the responsibility of the judges for its propriety in the particular instance. . . . If the court may act at discretion despite the commissioners' actual dissent, it follows that to consult them is but an act of courtesy which may be dispensed with without impairing the right founded on a judicial order."

*(c)* The tranportation of jurors to the *locus in quo* of the matter in controversy.

*(d)* The appointment of custodians of ballot-boxes after elections. This is done after nearly every election in Lackawanna County. Thousands of dollars are paid out of the county treasury for such custodians. The appointment of such custodians is often vitally necessary.

*(e)* The appointment of bodyguards to protect judges from violence in the performance of their duties and on their journeys to and from the courts. In California a bodyguard thus appointed found it essential to the proper functioning of the judge that he kill the judge's assailant, thereby proving that said appointment was "reasonably necessary."

Tipstaffs and court interpreters were appointed by courts and judges long before there were any statutes on the subject. Many statutes only give formal expression to what are already inherent powers of the agencies of government, exactly as many statutes only give formal expression to what is already a part of the common law.

This county and other counties supply many things to the judges that are not specifically authorized by statute. It is true that the statute authorizes the commissioners to furnish an office for each judge and also to furnish office furniture and stationery required for each of the county officers and also to furnish fuel and light. In fact, these things were done long before there was any statute enacted on the subject. Neither this nor any other statute specifically authorizes the county under the direction of the commissioners to furnish judges with water for drinking and ablutions. The county, under the direction of the commissioners, also furnishes each judge with a private washroom, although there is no statutory authority for the same. The county, under the direction of the commissioners, furnishes each of the judges with an office rug, although there is no specific statutory authority to do so unless the word "furniture" be interpreted to include rugs. The county, under the direction of the commissioners, furnishes each judge with a set of Purdon's Digest, although there is no specific statutory authority to do so. The county likewise furnishes each judge with a telephone in his office, although there is no specific statutory authority to do so. The county likewise furnishes each judge with postage stamps, although there is no specific statutory authority to do so.

In many counties of the State the county, under the direction of the county commissioners, furnishes the judges of the court with complete law libraries. This is done in the neighboring County of Luzerne. In fact, in the County of

Lackawanna the county purchased for the use of the president judge a set of "Corpus Juris" at a cost of about $400. Part of this set was purchased while the late H. M. Edwards was president judge and the later volumes have been added to this set and paid for by the county during the incumbency of the present president judge, E. C. Newcomb.

### Further discussion of the law.

It might be argued that, since the Act of May 1, 1907, P. L. 135, confers upon the law judges of each of the several Courts of Common Pleas the power to select and appoint a stenographer or stenographers to report all suits and proceedings in their respective courts, the statute, by implication, forbids the appointment of any other officials or clerks to assist the judges in the performance of their duties. This argument is not tenable. In the first place, the Act of 1907 conferred on the judges no power which was not already included in their inherent powers. The act was probably passed to prevent some one's raising the question that was raised in the case now before us. The statute clearly does not imply that if the judge appoints a court stenographer he exhausts his powers to appoint clerks or others to assist him in the due discharge of his judicial duties.

This very question was decided in the opinion of the Supreme Court of Wisconsin in Stevenson v. Milwaukee County, 140 Wis. 14; s. c., 17 Am. & Eng. Ann. Cas. 901. In that case, the Supreme Court held that the courts of Wisconsin were created by the Constitution of Wisconsin and did not depend solely upon statutes for their powers; that, independent of statute, such constitutional courts have inherent power to make such rules and orders as may be necessary to properly perform their functions; that when it seems necessary to the judge of a circuit court that an attendant upon the court, in addition to the sheriff and his deputies (as directed by statute), should be appointed, it is his right to make the appointment for such time as the necessity exists; that the statute requiring the sheriff to attend upon the circuit court during its session and file a list of his deputies, not exceeding three, does not deprive the judge, in case a necessity exists, of the power of appointing an attendant upon the court. "We think it clear," said the Supreme Court, "that where it seems to the judge necessary that an attendant upon the court, in addition to the sheriff and his deputies, should be appointed, it is his right to make the appointment for such time as the necessity exists."

It is to be observed that in the above-cited case the court used the word "necessary" in holding that any appointment the court deemed necessary (to the due administration of justice) to make, it had the right to make. To hold that the courts do not have inherent power to make any appointments which are necessary to the due performance of their duties would be to paralyze the courts in the performance of their duties. When the necessity is reasonably apparent, the power of the court to make such appointments cannot be successfully challenged. The word "necessary" in this connection should, we think, be interpreted as Chief Justice Marshall interpreted the word in the famous case of McCulloch v. Maryland, 4 Wheaton, 316, in which opinion he announced the decision of the United States Supreme Court that Congress, in the exercise of the express powers given it by section 8 of article I of the Constitution, to wit, inter alia, the power "to declare war, . . . to raise and support armies, . . . to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, . . ." had the right to incorporate a national bank, and that a branch of that bank which was established in Maryland could not be taxed by the State of Maryland without violating

the Constitution of the United States. In his opinion, Chief Justice Marshall defined the word "necessary," as used in the above-quoted provision of the Constitution, as follows, page 407:

"Although, among the enumerated powers of government, we do not find the word 'bank' or 'incorporation,' we find the great powers to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies. . . . It may with great reason be contended that a government entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution by withholding the most appropriate means. . . .

"(Page 413) : Does it (the use of the word 'necessary') always import an absolute physical necessity, so strong, that one thing, to which another may be termed necessary, cannot exist without that order? We think it does not. If reference be had to its use in the common affairs of the world or in approved authors, we find that it frequently imports no more than that one thing is convenient or useful or essential to another. To employ the means necessary to an end is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable."

Chief Justice Marshall says in another part of his opinion, in effect, that a right is incidental to a power expressly given when it is conducive to its beneficial exercise (page 418).

He says, further (page 421) : "We think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate; let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional."

We believe this language can be appropriately paraphrased to apply to the situation before us as follows:

We think the sound construction of the powers of courts created by the State Constitution must allow to the courts that discretion, with respect to the means by which their powers are to be carried into execution, which will enable the courts to perform the duties assigned to them in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the court's jurisdiction, and all means which are appropriate to that end which are not prohibited, but consistent with the letter and spirit of the functions of the court, are within the court's inherent powers.

### Judicial power not dependent upon statute.

In Pennsylvania the judicial power is vested in the courts primarily, not by statute but by the Constitution. Article v, section 1, of the Constitution of Pennsylvania provides as follows: "The judicial power of this Commonwealth shall be vested in a Supreme Court, in Courts of Common Pleas," etc.

The people through the Constitution have vested the courts with judicial power, and that grant of power carries with it certain inherent powers neces-

sary to the proper functioning of the courts in which the judicial power is vested.

Even a legislative enactment that attempted to abridge the inherent powers of the courts or the inherent powers of any other branch of government, such as, for example, the executive, would be set aside.

In the notable case of Myers v. United States, decided Oct. 25, 1925, reported in 47 Sup. Ct. Repr. 21; s. c., 272 U. S. 52, the United States Supreme Court, in an opinion by Chief Justice Taft, held that an Act of Congress which required the consent of the Senate to the removal by the President of postmasters of the first, second and third classes was invalid. The reasoning of the Supreme Court was that since article II of the Constitution of the United States grants to the President the executive power of government, the power of removal of executive subordinate officers was incidental to this power; in other words, that the President had the inherent power to remove subordinates in the executive branch of the government without the consent of the upper branch of Congress, and that this was true even though the office from which the officer was removed was created by Act of Congress and even though the Act of Congress creating the position provided for the removal of occupants only with the consent of the upper branch of Congress. The Supreme Court of the United States held this in spite of the fact that the Constitution itself vests in the President the power of appointment only by and with the advice and consent of the Senate. Chief Justice Taft, in his opinion, said, inter alia (47 Sup. Ct. Repr. 30) : "Made responsible under the Constitution for the effective enforcement of the law, the President needs as an indispensable aid to meet it the disciplinary influence upon those who act under him of a reserve power of removal."

The Chief Justice quoted from an opinion by Mr. Justice Miller in Cunningham v. Neagle, 135 U. S. 1, at page 63; s. c., 10 Sup. Ct. Repr. 658, 668, as follows: "The Constitution, section 3, article II, declares that the President 'shall take care that the laws be faithfully executed,' and he is provided with the means of fulfilling this obligation by his authority to commission all the officers of the United States, and by and with the advice and consent of the Senate to appoint the most important of them to fill vacancies."

Chief Justice Taft quoted (47 Sup. Ct. Repr. 43) from a message of President Cleveland as follows: "I believe the power to remove or suspend such officials is vested in the President alone by the Constitution, which in express terms provides that 'the executive power shall be vested in a President of the United States of America,' and that 'he shall take care that the laws be faithfully executed.' "

The Chief Justice said, further (47 Sup. Ct. Repr. 40) : "The power of removal must remain where the Constitution places it, with the President, as part of the executive power. . . ."

He said, further (47 Sup. Ct. Repr. 29) : "A reference of the whole power of removal to general legislation by Congress is quite out of keeping with the plan of government devised by the framers of the Constitution. It could never have been intended to leave to Congress unlimited discretion to vary fundamentally the operation of the great independent executive branch of government and thus most seriously to weaken it. It would be a delegation by the convention to Congress of the function of defining the primary boundaries of another of the three great divisions of government."

As the courts of Great Britain are historically the parents of our American courts, it may be pertinent to note the fact that practically all powers exercised by the British courts are derived not from statute but are held to be

inherent in the creation of the courts themselves. The court having been created by royal decree and the judges being in possession of a royal judicial commission, the courts and the judges thereof exercise all the powers naturally inherent in the institution or position thus created. At the time that the American Bar Association met in Great Britain in 1924, Mr. Justice Greer delivered an address at Gray's Inn, July 24, 1924, which is reported in 10 American Bar Association Journal (No. 10), page 721. Mr. Justice Greer said, in part: "There is no statute, no act of Parliament, under which we get our privileges and powers and under which we perform our duties; there is no charter from the Crown which gives us those privileges, so far as we can discover. We exercise our rights because we have exercised them for hundreds of years, and I trust we will be allowed to exercise them for hundreds of years to come. We have for our rights the same groundwork that those who live under the common law have for the rights given to them by the common law. . . . When we judges go circuit we take with us a companion (at the expense of the nation) who is called our marshal."

Presumably this marshal is appointed by the court in the exercise of its inherent powers.

Little v. State, 90 Ind. 338, 339; s. c., 46 Am. Rep. 224: "Courts of justice possess powers which were not given by legislation and which no legislation can take from them. . . . There are inherent powers resident in all courts of superior jurisdiction. These powers spring not from legislation, but from the nature and constitution of the tribunals themselves."

In re Waugh, 32 Wash. 50; s. c., 72 Pac. Repr. 710: "It must necessarily be that the court has inherent power to preserve its existence and to fully protect itself in the orderly administration of its business."

Sanders v. State, 85 Ind. 318, 328; s. c., 44 Am. Rep. 29: "That courts possess inherent powers not derived from statute is undeniably true."

### Further discussion of the facts.

The only limitation on the inherent power of the court to appoint clerical or other attachés to facilitate the dispatch of the court's business is that the appointment shall be reasonably necessary.

Any lawyer at the bar who has any practice whatsoever finds it necessary in these modern days to have a clerical or stenographic assistant. A judge of the Court of Common Pleas of Lackawanna County who attends to his full share of the business of the court has as much legal work to do as has the busiest practitioner at the bar. It would be absurd for such a practitioner to attempt to take care of his law business without the help of one or more clerical assistants. It would be equally absurd for a judge of the Court of Common Pleas to attempt to take care of the many judicial matters that come to him daily in his office without at least one clerical or stenographic assistant almost constantly on duty in that office. Such a clerical assistant is not only a necessity to a judge, but he is also a great convenience to members of the bar, as every member of the bar well knows and if asked would so state. That judges in former years got along without secretaries or stenographers is no more a valid argument against employing such assistance now than is the fact that people in former years got along without electricity or automobiles a valid argument against the use of electricity and automobiles now. What is non-existent in one generation becomes the luxury of the second generation and the necessity of the third. The fact that judges of all courts, both trial courts and appellate courts, everywhere have one or more secretarial or stenographic assistants is sufficient proof—if proof other than reason and

common sense is called for—that such assistants are reasonably necessary to the dispatch of the business of courts and of judges thereof.

As proof that the judges of this county are not over-supplied with clerical assistants we might cite the fact that Allegheny County, with a population of only about four times that of Lackawanna County, has for the Court of Common Pleas of that county nine official stenographers and seven assistant court stenographers, each one of the latter being designated to assist the judges in their work in chambers, the salaries of the stenographers and assistants ranging from $4600 a year to $1920 a year. In Schuylkill County the three judges have appointed three assistant official stenographers, each one of whom is assigned to one of the judges to assist in his work in chambers. In the neighboring County of Luzerne there are three official stenographers and five assistant official stenographers. The lowest salary received by any of these assistant stenographers is $1800 per year. In regard to these assistant stenographers who attend the judges in chambers, we have been informed by one of the judges of the Luzerne County court as follows: "Our court has appointed assistant stenographers and each judge has for regular work a stenographer who does public business also. The assistants are at all times employed in the offices of the judges, each judge having one assistant to attend to public business and to be ready to substitute for the regular stenographers. The salaries are paid by the county. These assistant stenographers greatly aid us in the expedition of public business."

In Philadelphia County there are fifteen official stenographers and numerous assistant stenographers. In the neighboring Counties of Susquehanna, Bradford and Monroe, and in every other county of the State, as far as we have been informed, each judge has appointed a stenographer or clerk to assist him in chambers in the performance of his duties.

### Conclusion.

Our conclusion is that the appointment by Judge Watson of Miss Amelia S. Koch as clerk in his judicial office was an appointment reasonably necessary to the due dispatch of the judicial business entrusted by the Commonwealth to Judge Watson, and that among the powers inhering in him by virtue of his office as judge was the power to make said appointment.

Our conclusion, further, is that since the order filed by Judge Newcomb in the above-entitled case was made by him without the case having been heard before the court in banc or before any two of the three judges of said court, and without the concurrence of either one of the two additional law judges of the said court, said order and the judgment entered pursuant to said order is invalid. As one of the additional law judges of the Court of Common Pleas of Lackawanna County, we—to quote the language of the Supreme Court in the recent case of Sterrett v. MacLean et al., already cited in this opinion—"challenge the right of the president judge to act for the whole court" in this matter, and to quote further from the language of that case, "the record does not show that the final decree was entered after consultation with the other judges of the district, and the plain intent of the Act of 1876 requires the attendance of more than one judge where the bench consists of more than one."

The language used by Mr. Chief Justice Moschzisker on Jan. 3, 1928, in the case of Com. v. Hall, 291 Pa. 341, 354, we think is most appropriate for us to use in closing this opinion: "When a judge exercises a power not conferred upon him by law, his act is more than a mere irregularity; . . . it is a

nullity." Of this principle so recently laid down by the Chief Justice of the Commonwealth every judge of this court and every official of this county should take due notice and govern himself accordingly.

From William A. Wilcox, Scranton, Pa.