Federico PENA, Mayor of Denver, T.J. Hackworth, Salvador Carpio, Robert Crider, Hiawatha Davis, Jr., Cathy Donohue, Nieves McIntire, Cathy Reynolds, William Scheitler, John J. Silchia, and Paul Swalm, Members of the Denver City Council, Michael Licht, Denver City Auditor, Thomas Shaw, Denver Manager of General Services, and William E. Smith, Denver Manager of Public Works, Petitioners,

v.

The DISTRICT COURT OF the SECOND JUDICIAL DISTRICT In and For the CITY AND COUNTY OF DENVER, and the Honorable Sandra I. Rothenberg, District Court Judge in and for the City and County of Denver, Elmer E. Mozee, Defendant, James D. Thomas, State Court Administrator, Respondents.

No. 83SA286.

Supreme Court of Colorado, En Banc.

April 30, 1984.

Max P. Zall, City Atty., George J. Cerrone, Jr., Asst. City Atty., Denver, for petitioners.

Hughes & Dorsey, Karen J. Mathis, Nancy Reid, Denver, for respondents.

NEIGHBORS, Justice.

This is an original proceeding filed pursuant to C.A.R. 21 and section 3 of article VI of the Colorado Constitution in which the petitioners, Mayor Federico Pena, et al., contest the respondent judge's jurisdiction to order the issuance of an amended citation to show cause why the City and County of Denver should not be required to lower the temperature in Courtroom 21 of the Denver District Court. We issued a rule to show cause why the respondents should not be prohibited from proceeding against the petitioners pursuant to the amended citation to show cause. We now make the rule absolute.

I.

On June 8, 1983, Judge Sandra I. Rothenberg, respondent, was presiding over a criminal case in the Denver District Court in which the defendant was charged with

attempted murder.[1] The trial was proceeding routinely in Courtroom 21 when a young, healthy juror became ill from the heat. The trial was delayed while the juror rested. During this time, the respondent judge spoke with William H. McNichols, then Mayor of the City and County of Denver (County). Mayor McNichols advised the respondent that it was the responsibility of the State of Colorado (State) rather than the County to cool the courtroom. On that day, the respondent judge directed the Clerk of the Denver District Court to issue a citation to show cause ordering Governor Richard D. Lamm and Mayor McNichols, or their authorized representatives, to appear before the court on July 6, 1983, to show cause "why they should not be ordered to lower the temperature in Courtroom 21 of the Denver District Court to a habitable, healthful and properly ventilated temperature." The citation was served upon the appropriate person in both the governor's and the mayor's offices.

On June 28, 1983, the respondent judge held an informal prehearing conference for the purpose of clarifying the issues to be resolved on July 6. Attorneys representing the State and the County orally requested that the respondent court vacate the order and quash the citation on the grounds that the respondent court lacked personal and subject matter jurisdiction over them and had acted without and in excess of its statutory authority by issuing the order and citation. The respondent judge directed counsel to file written motions and continued the case until July 6, 1983.

On July 6, 1983, the respondent judge conducted a hearing. At the conclusion of the hearing, she (1) granted the State's motion to dismiss on the ground that it has no duty to provide adequate courtrooms in Denver County; (2) determined that the County was responsible for maintaining adequate courtroom conditions, specifically ventilation of Courtroom 21; (3) ordered the clerk of the court to issue an amended citation to show cause directed to all parties necessary for a full adjudication of the issues;[2] (4) set a hearing date of July 19, 1983, in order to permit the added parties to present their arguments regarding the adequacy of the courtroom facilities, the necessity of court intervention, and the appropriate remedy, if any; and (5) denied the petitioners' motion for a stay of the proceeding.

The petitioners were served with the amended citation on July 12, 1983, and filed this original proceeding on July 13, 1983. We issued the rule to show cause and ordered a stay of proceedings in the respondent court on July 14, 1983.

The petitioners concede that Colorado courts possess inherent powers. However, they claim that the doctrine of inherent powers has been abrogated, or at least severely limited, by the adoption of constitutional, statutory, procedural, and administrative rules and regulations. Since the petitioners contend that the district court failed to comply with the applicable rules and procedures, they argue that the court acted without and in excess of its jurisdiction by ordering the clerk to issue an amended citation to show cause why the petitioners should not be ordered to lower the temperature in Courtroom 21.

II.

■ Article III of the Colorado Constitution divides the powers of state government into three distinct and co-equal branches or departments and directs that, "[n]o person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others...." The fundamental meaning of the separation of

---

1. The caption of the case is *People v. Elmer E. Mozee,* Criminal Action No. 82CR2097.

2. The parties to whom the amended citation was issued include the following officials of the City

and County of Denver: mayor, members of the city council, auditor, general services manager, and public works manager; as well as James D. Thomas, State Court Administrator.

powers doctrine is that the three branches of government are separate, coordinate, and equal. In *Smith v. Miller*, 153 Colo. 35, 40–41, 384 P.2d 738, 741 (1963), we stated:

"It is an ingrained principle in our government that the three departments of government are coordinate and shall co-operate with and complement, and at the same time act as checks and balances against one another but shall not interfere with or encroach on the authority or within the province of the other. The legislative and executive departments have their functions and their exclusive powers, including the 'purse' and the 'sword.' The judiciary has its exclusive powers and functions, to-wit: it has judgment and the power to enforce its judgments and orders. In their responsibilities and duties, the courts must have complete independence. . . . [I]t is the genius of our government that the courts must be independent, unfettered, and free from directives, influence, or interference from any extraneous source. It is abhorrent to the principles of our legal system and to our form of government that courts, being a coordinate department of government, should be compelled to depend upon the vagaries of an extrinsic will. Such would interfere with the operation of the courts, impinge upon their power and thwart the effective administration of justice. These principles, concepts, and doctrines are so thoroughly embedded in our legal system that they have become bone and sinew of our state and national polity."

The separation of powers doctrine imposes upon the judiciary a proscription against interfering with the executive or legislative branches, as well as a duty to perform its constitutional and statutory obligations with complete independence. *See Smith*, 153 Colo. at 40, 384 P.2d at 741. This latter aspect of the separation of powers doctrine places on courts the "affirmative obligation[s] to assert and fully exercise their powers, to operate efficiently by modern standards, and to protect their independent status. . . ." Carrigan, *Inherent Powers and Finance, Trial*, Nov.-Dec.

1971, at 22. The inherent powers which courts possess consist of: "[A]ll powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence, and integrity, and to make its lawful actions effective. These powers are inherent in the sense that they exist because the court exists; the court *is*, therefore it has the powers reasonably required to act as an efficient court." *Id.* (Emphasis in original.) Accordingly, this court has adopted the general rule that the judicial branch of government possesses the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities. *Smith*, 153 Colo. 35, 384 P.2d 738. The policy consideration supporting this rule was stated cogently in *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193, 202 (1971) (Pomeroy, J., concurring):

"It must be acknowledged also that critically important needs, especially in the large cities, are competing strenuously for a share of tax revenues, and this in a period of serious inflation. No evidence is required to establish that governments at all levels are experiencing severe financial strains. As the opinion of the Court points out, however, the court system in Philadelphia is not just another competing cause or need; it is itself a separate branch of government, co-equal with the executive and legislative branches headed by the defendants in this case. The distinction is one not of degree, but of kind. No doubt the courts must be mindful, in making the estimates of their financial needs, of the needs of the total community and of the problems of the legislative branch in funding them; but the courts having made their determination as being reasonably necessary to performance of their constitutional functions, it is not for the legislative branch to deny the reasonableness or the necessity on the ground that something else is more urgent or more important."

(Footnote omitted.)

The doctrine of the courts' inherent power to order the legislative or executive de-

partments to provide the funds reasonably necessary to operate the judicial branch of government is not of recent origin. As the Pennsylvania Supreme Court stated in *Commonwealth ex rel. Carroll,* 274 A.2d at 199:

> "Mr. Chief Justice Marshall said in *McCulloch v. Maryland,* 17 U.S. 316, 431, 4 Wheat. 316, 4 L.Ed. 579 (1819), '... the power to tax involves the power to destroy; ...' A Legislature has the power of life and death over all the Courts and over the entire Judicial System. Unless the Legislature can be compelled by the Courts to provide the money which is reasonably necessary for the proper functioning and administration of the Courts, our entire Judicial system could be extirpated, and the Legislature could make a mockery of our form of Government with its three co-equal branches—the Executive, the Legislative and the Judicial."

■ Trial courts have increasingly invoked the inherent powers doctrine to compel appropriations or expenditures of funds for judicial purposes. Appellate courts have uniformly upheld the exercise of this power when such expenses were reasonably necessary to the efficient operation of the court or the performance of judicial functions and were made necessary by the refusal of the executive or legislative branch to honor reasonable requests.[3] However, the inherent power of courts is not unlimited. The public interest requires that the three branches of government work cooperatively and in harmony. *See Knuepfer v. Fawell,* 96 Ill.2d 284, 70 Ill. Dec. 708, 449 N.E.2d 1312 (1983). Thus,

courts must proceed cautiously when invoking their inherent powers. The need which causes a court to invoke such powers must be reasonably necessary for its proper functioning, and this determination is subject to appellate review. Moreover, a court may exercise its inherent powers only when established methods for procuring necessary funds have failed and the court has determined that the assistance necessary for the effective performance of judicial functions cannot be obtained by any other means. *See O'Coin's, Inc. v. Treasurer of County of Worcester,* 362 Mass. 507, 287 N.E.2d 608 (1972).

### A.

■ The petitioners argue that by adopting C.R.C.P. 106(a) this court has abolished the practice of using special writs and directed that rules and procedures which provide due process be followed in matters formerly resolved by such extraordinary proceedings. Thus, the petitioners argue that the respondent court lacked in personam and subject matter jurisdiction over them because (1) the court could not exercise jurisdiction without the filing of a complaint and summons; and (2) there are no adverse parties in the proceeding, thus no controversy exists.

These arguments are without merit. In *Lawson v. Pueblo County,* 36 Colo.App. 370, 540 P.2d 1136 (1975), the court of appeals held that relief in the nature of mandamus is a proper remedy to force compliance with a statute which contains mandatory language and places continuing responsibility in the counties to provide

---

**3.** *Rose v. Palm Beach County,* 361 So.2d 135 (Fla.1978); *Knuepfer v. Fawell,* 96 Ill.2d 284, 70 Ill.Dec. 708, 449 N.E.2d 1312 (1983); *Noble County Council v. State,* 234 Ind. 172, 125 N.E.2d 709 (1955); *In re Appointment of Clerk of Court of Appeals,* 297 S.W.2d 764 (Ky.App. 1957); *O'Coin's, Inc. v. Treasurer of County of Worcester,* 362 Mass. 507, 287 N.E.2d 608 (1972); *Judges for the Third Judicial Circuit v. County of Wayne,* 190 N.W.2d 228, 386 Mich. 1, *cert. denied,* 405 U.S. 923, 92 S.Ct. 961, 30 L.Ed.2d 794 (1971); *State ex rel. Weinstein v. St. Louis County,* 451 S.W.2d 99 (Mo.1970); *State ex rel. Hillis v. Sullivan,* 48 Mont. 320, 137 P. 392 (1913);

*Bass v. County of Saline,* 171 Neb. 538, 106 N.W.2d 860 (1960); *In re Salaries for Probation Officers of Bergen County,* 58 N.J. 422, 278 A.2d 417 (1971); *State ex rel. Kitzmeyer v. Davis,* 26 Nev. 373, 68 P. 689 (1902); *State ex rel. Finley v. Pfeiffer,* 163 Ohio St. 149, 126 N.E.2d 57 (1955); *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193 (1971); *State ex rel. Moran v. Department of Administration,* 103 Wis.2d 311, 307 N.W.2d 658 (1981); *In re Courtroom and Officers of Circuit Court,* 148 Wis. 109, 134 N.W. 490 (1912); *In re Janitor of Supreme Court,* 35 Wis. 410 (1874).

court facilities. The court reasoned that, "[i]ndeed, to deny a remedy to the judiciary ... would not only make that branch of government subservient to the arbitrary action (or inaction) of the executive branch but would also allow the executive branch to ignore, with impunity, the specific directives of the legislative branch." 36 Colo.App. at 373, 540 P.2d at 1138. In *Smith*, 153 Colo. 35, 384 P.2d 738, the judges of the district court initiated suit against the El Paso County Commissioners by filing a complaint in which they requested a writ of mandamus and a declaratory judgment. The trial court entered the judgment requested and ordered the county commissioners to pay the salaries of district court employees as fixed by the judges. This court upheld the trial court's ruling and approved the procedure used in that case, but indicated that such a procedure is not the exclusive remedy. We stated:

> "As pointed out above, the judiciary, as one of the separate departments of the governmental structure, is charged with the administration of justice and must be free to perform its functions without restriction or impairment by the acts or conduct of another department. Hence a proper procedure in the circumstances shown by this record would have been for the judges involved to have certified to the Board of County Commissioners a schedule of salaries fixed for the compensation of the several clerical employees involved, whereupon it would devolve upon the Board to procure and furnish the funds to meet such schedule. *In the event of its failure or refusal to do so, the court might properly issue a citation or rule directed to the Board to show cause why an order should not be entered compelling compliance with the schedule as so certified.* Unless the Board was able to establish that the schedule of salaries so fixed was wholly unreasonable, capricious and arbitrary, an order compelling compliance therewith could be entered. We do not hesitate to affirm the judgment since it is clear that had a different procedure been

pursued the result here would be the same."

*Id.* at 42–43, 384 P.2d at 742 (emphasis added).

Courts of other jurisdictions have similarly recognized the power of courts to initiate proceedings by means other than institution of a civil action. *See Knuepfer*, 70 Ill.Dec. 708, 449 N.E.2d 1312 (case began as court's administrative order); *O'Coin's, Inc.*, 287 N.E.2d 608 (court upheld the inherent right of a judge to issue an *ex parte* order for a tape recorder since a court reporter was unavailable); *Schwartz v. Jacobs*, 352 S.W.2d 389 (Mo. App.1961) (process may be in the form of an order to show cause); *State ex rel. Moran v. Department of Administration*, 103 Wis.2d 311, 307 N.W.2d 658 (1981) (the court has power to issue an *ex parte* order without formally instituting an action in order to preserve the full and free exercise of its judicial functions); *State v. County Court of Kenosha County*, 11 Wis.2d 560, 105 N.W.2d 876 (1960) (court upheld trial court's order directing county commissioners to pay for air conditioning unit which judge had installed in chambers).

### B.

The petitioners also contend that the respondent judge's inherent power to order the clerk to issue the amended citation to show cause has been abrogated, or at least superseded, by the provisions set forth in section 5, article VI of the Colorado Constitution; section 13–3–108, C.R.S.1973; and Chief Justice Directive No. 79–6. We disagree with their argument.

■ Under our constitution, the inherent power of a court to compel the expenditure of funds reasonably necessary for the adequate functioning of the court system is lodged in the judiciary. Therefore, such inherent power cannot be taken from the courts and given to either the executive or legislative branches. *See State ex rel. Moran*, 307 N.W.2d at 662. In this case, however, the respondent court exceeded its authority in issuing an amended citation to

show cause without adhering to applicable procedural requirements.

Historically, Colorado law has placed the duty of providing suitable courthouse facilities upon the county commissioners of each county. *See Lawson,* 36 Colo.App. at 372, 540 P.2d at 1137; section 30–11–104, C.R.S. 1973. In 1969, by amendments adopted to chapter 37, C.R.S.1963, the General Assembly indicated its intention to take over the financial burden of providing adequate judicial facilities. *See* Colo.Sess.Laws 1969, ch. 101, 37–11–10 at 247, C.R.S.1963. However, the General Assembly provided in section 13–3–108(1), C.R.S.1973, that the county commissioners, with certain exceptions, must provide and maintain adequate courtrooms and other facilities. Specifically, section 13–3–108, C.R.S.1973, stated:

> *"Maintenance of court facilities—capital improvements.* (1) The board of county commissioners in each county shall continue to have the responsibility of providing and maintaining adequate courtrooms and other court facilities including janitorial service, except as otherwise provided in this section.
>
> (2) The court administrator, subject to the approval of the chief justice, shall prepare annually a capital construction budget. The capital construction budget shall specify: The additional court housing facilities required for each court; the estimated cost of such additional structures or facilities and whether such additional court structures or facilities will include space used by other governmental units for nonjudicial purposes; and a detailed report on the present court facilities currently in use and the reasons for their inadequacy. A copy of such capital construction budget shall be submitted to the joint budget committee of the general assembly and the executive budget office on or before the first day of October of 1970, and each succeeding year.
>
> (3) The court administrator shall prepare and submit on or before November 1, 1970 and the first day of each November thereafter, a long-range judicial construction plan. Such plan shall outline on a priority basis the capital construction needs of each court, by county, for the next five years. A copy of the long-range judicial construction plan shall be filed annually with the joint budget committee of the general assembly and the executive budget committee.
>
> (4)(a) The chief justice is authorized to approve payment of state funds for the construction of any capital improvement facilities to be used for judicial purposes authorized and approved by the general assembly.
>
> (b) The court administrator, with the approval of the chief justice, shall enter into leasing agreements with the governing body of the appropriate local unit of government when joint construction is authorized, or when the approved facilities are also to be used for nonjudicial purposes. The leasing agreement shall provide for the payment of state funds for that portion of the construction costs related to the operation of the courts."

In 1974, the state court administrator, after following the statutory procedure set forth above, filed an action seeking a writ in the nature of mandamus against the Pueblo County Commissioners to enforce subsection (1) of the statute. *See Lawson,* 36 Colo.App. 370, 540 P.2d 1136. The chronology of events which resulted in the filing of the suit in *Lawson* are these: The General Assembly authorized an additional district judge for the Tenth Judicial District and appropriated money for the necessary salary and equipment. However, the General Assembly failed to appropriate funds to construct additional courtroom facilities. Relying on sections 13–3–108(1) and 30–11–104, C.R.S.1973,[4] the court of appeals held that since the State had refused to appropriate the necessary monies, Pueblo County was responsible for providing adequate courtroom facilities, notwithstanding the

---

4. Section 30–11–104, C.R.S.1973, provides:
    *"County buildings.* Each county, at its own expense, shall provide a suitable courthouse, a sufficient jail, and other necessary county buildings, and keep them in repair."

provisions of section 13–3–108. Accordingly, the court of appeals ruled that the trial court properly issued a writ of mandamus ordering the county to provide adequate courtroom facilities. However, the court stated that the order should contain only guidelines which the board must follow governing the physical requirements needed to maintain an adequate courtroom facility such as acceptable dimensions, partitions, and ventilation. The court held that the trial court "went too far in ordering that a specific location be made available to the judiciary." *Id.* at 374, 540 P.2d at 1139.

Since *Lawson* was decided, subsections (2) and (3) of section 13–3–108 have been amended. *See* section 13–3–108, C.R.S.1973 (1983 Cum.Supp.). Significantly, the legislature added subsection (5) which provides:

"(5) On and after July 1, 1975, construction or remodeling of any court or court-related facility shall be commenced only with prior approval of the chief justice of the Colorado supreme court after consultation with the board of county commissioners; except that a board of county commissioners, at its discretion, may take such actions."

Thus, at present, improvements requiring capital outlay, which include improvements classified as "construction" or "remodeling," may be undertaken *only* after approval by the Chief Justice of the Colorado Supreme Court after consultation with the board of county commissioners.

In addition, this court has promulgated administrative rules governing the internal operations and administration of the Colorado judicial system. Article VI, section 5(2) of the Colorado Constitution provides that the chief justice is the executive head of the judicial system. Article VI, section 5(4) provides that the chief justice shall appoint a chief judge for each judicial district and that each chief judge "shall have and exercise such administrative powers over all judges of all courts within his district as may be delegated to him by the chief justice." Based on this grant of constitutional power, former Chief Justice Paul V. Hodges issued a "Directive Concerning the Delegation of Authority and Responsibility to Chief Judges" which is numbered and identified as CJD No. 79–6. This directive delineates the division of authority within the Colorado judicial system. Specifically, the directive provides that each chief judge "shall submit all requests for capital outlay to the state court administrator" and "shall approve all equipment leases or rentals and submit the same to the state court administrator for review prior to consummating the agreement." These provisions set forth specific procedural guidelines which courts must follow in requesting the necessary monies and improvements from either the State or the responsible county board.

We conclude that although the respondent judge possessed the inherent power to order the issuance of the amended citation to show cause, she exceeded her authority in this case. Under the provisions of the constitution, statutes, and directive of the chief justice which we have discussed in this opinion, the authority to initiate proceedings for the construction and maintenance of adequate court facilities is vested in the chief judge of each judicial district and the Chief Justice of the Colorado Supreme Court who makes the final decision. To hold otherwise could subject officials in the legislative and executive branches of government to inconsistent orders entered by each county, district, and appellate judge in the State of Colorado.

### C.

Finally, the petitioners urge this court to hold that the State rather than the County is responsible for lowering the temperature in Courtroom 21. In light of our resolution of this case on other grounds, we decline to address the issue of the proper allocation of financial responsibility for providing adequate court facilities between the State and the City and County of Denver.

The rule to show cause is made absolute.

DUBOFSKY, J., dissents.

DUBOFSKY, Justice, dissenting:

I respectfully dissent. The majority rules that the respondent district court possesses the inherent power to order the issuance of a citation to show cause why the City and County of Denver and the state court administrator should not be required to provide air conditioning, but concludes that the district court lacks the authority to do so. I believe that we lack the information necessary to determine whether the respondent court acted properly, and I would remand this case for a hearing on the issue of whether the established methods for providing funds necessary for the efficient functioning of the court have failed.[1] Therefore, I would discharge the rule.

I agree with the majority holding that a court has inherent power to do those things reasonably necessary for the efficient performance of its judicial functions. One of the court's most important responsibilities is ensuring that citizens receive a fair trial. It is obvious to me that the respondent court cannot perform its functions efficiently and fairly if its courtroom is so hot that jurors faint and become ill. I agree also with the majority observation that the doctrine of inherent powers has the potential to create damaging political conflicts with other branches of government, and that it should·only be invoked in situations of clear necessity. The procedure described in Chief Justice Directive No. 79–6 is important and should be followed in most circumstances, thereby reducing conflicts between the judicial branch of government and the executive and legislative branches. However, where the method contained in Directive No. 79–6, or other established methods for procuring necessary funds have been attempted and the attempts have failed, a district court maintains its authority to order expenditures necessary for the effective performance of its own functions under the inherent powers doctrine. *See Rose v. Palm Beach City*, 361 So.2d 135 (Fla.1978); *Knuepfer v. Fawell*, 96 Ill.2d 284, 70 Ill.Dec. 708, 449 N.E.2d 1312 (1983); *O'Coin's, Inc. v. Treasurer of County of Worcester*, 362 Mass. 507, 287 N.E.2d 608 (1972).

The only evidence in the record before us on this issue is a statement by the respondent district court to the effect that the state court administrator had indicated to the court his refusal to request funds for air conditioning from the General Assembly or to bring any action against Denver. If this is the case, and I have no reason to believe that it is not, this court should not conclude, as has the majority, that the respondent court lacks the authority to order the issuance of a citation to show cause. The majority's result is to some extent based on its conclusion that the Chief Justice Directive removes all inherent powers from every judge except for the chief judge of every district and the chief justice. I read the Directive as providing a procedure to be followed in most cases, not as a document doing away with a court's common-law power to control its own courtroom in a way necessary for the fulfillment of its judicial duties.

The record before us indicates that the parties were not specifically advised of the need to discuss the issue of the failure of established methods. Therefore, I would discharge the rule but suggest to the court that further proceedings should include a consideration of whether established methods to obtain adequate courtroom facilities have failed.

---

**1.** The district court had scheduled a hearing to determine the adequacy of the courtroom facilities, the necessity of court intervention, and the appropriate remedy, if any. We stayed the scheduled hearing.