Pat REALE, Petitioner,

v.

BOARD OF REAL ESTATE
APPRAISERS,
Respondent.

No. 93SA319.

Supreme Court of Colorado,
En Banc.

Sept. 12, 1994.

Robert J. Loew, Adams County Atty., Ronald A. Carl, Asst. County Atty., Brighton, Law Firm of Leonard Chesler, Ben Klein, Co–Counsel, Denver, for petitioner.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Donna L. Rice, Asst. Atty. Gen., Regulatory Law Section, Denver, for respondent.

Chief Justice ROVIRA delivered the Opinion of the Court.

The question in this case is whether the General Assembly can add qualifications for holding constitutionally created offices in addition to those set forth in the constitution itself. The trial court concluded that it could and thus, entered a permanent injunction prohibiting Pat Reale, the elected assessor of Adams County, from continuing to hold the office of Adams County Assessor. We reverse and remand with directions to dismiss the complaint.

I

In 1990, the General Assembly passed the Real Estate Appraiser's Act, §§ 12–61–701 to –717, 5B C.R.S. (1991) (the Act), which requires, among other things, that real estate appraisers meet state licensing requirements and that county assessors be licensed.[1] The

---

1. The terms "appraiser" and "assessor" are not synonymous. "Assessor" refers to an elected

constitutional officer who performs the statutory and other duties of the office of assessor, while

Act establishes categories of registered, licensed, and certified appraisers. Pursuant to section 12–61–706, 5B C.R.S. (1994 Supp.), county assessors must obtain an appraiser's license by completing a minimum of fifty-five hours of classroom instruction and passing a standardized appraiser's examination.[2] The Act requires that county assessors comply with the licensing requirements within one year after taking office. § 12–61–714(2), 5B C.R.S. (1991). Reale has not met these requirements.

The State Board of Real Estate Appraisers (the Board) is charged with enforcing the Act. In 1993, the Board filed an action in the district court and requested a preliminary injunction seeking to prevent Reale from performing the duties of his office on the grounds that under the Act, he was not able to do so legally. In response, Reale argued, *inter alia,* that the Act was unconstitutional because the General Assembly did not have the power to impose additional qualifications for holding a constitutionally created office other than those set forth in the constitution itself.

The trial court declined to issue a preliminary injunction. However, after a trial on the merits, the court concluded that the Act served a compelling state interest, i.e., fair and accurate tax assessments, and was constitutional. Further, it held that the Act did not violate the guarantee of equal protection under the law and that the court was empowered to enjoin Reale from holding office. It entered a permanent injunction barring Reale from holding office as Adams County Assessor.

On appeal Reale reiterates his qualification argument and also contends that the licensing requirements of the Act violate his right to equal protection of the law.[3]

## II

■ The office of county assessor is created by article XIV, section 8 of the Colorado Constitution. Article XIV, section 10 of the Colorado Constitution provides: "No person shall be eligible to any county office unless he shall be a qualified elector; nor unless he shall have resided in the county one year preceding his election." Thus, the question presented is whether the qualifications for holding the office of county assessor provided for in article XIV, section 10 are exclusive, or whether the General Assembly may impose additional qualifications. Because we hold that the General Assembly may not impose additional qualifications as a prerequisite to holding the office of county assessor, we need not address Reale's equal protection argument.

## A

While no Colorado court has directly decided this question, it has been considered by the courts of many other states. "The law is well established that, where a state constitution provides for certain officials and names the qualification for such officers, the legislature is without authority to prescribe additional qualifications." *State v. Welch,* 198 Or. 670, 259 P.2d 112, 114 (1953). *See also Whitney v. Bolin,* 85 Ariz. 44, 330 P.2d 1003 (1958); *Thomas v. State,* 58 So.2d 173 (Fla. 1952); *People v. McCormick,* 261 Ill. 413, 103 N.E. 1053 (1913); *State ex rel. Palagi v. Regan,* 113 Mont. 343, 126 P.2d 818 (1942); *Gibbany v. Ford,* 29 N.M. 621, 225 P. 577 (1924); *Cornell v. McAlister,* 121 Okla. 285, 249 P. 959 (1926); *State v. Betensen,* 14 Utah 2d 121, 378 P.2d 669 (1963); C.T. Foster, Annotation, *Legislative Power to Prescribe Qualifications for or Consideration of Eligi-*

"appraiser" refers to one who estimates the value of real property for a fee or a salary. *See* § 12–61–702(5), 5B C.R.S. (1994 Supp.).

**2.** The stated purpose in imposing the licensing requirement is to meet the standard imposed by the federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989. § 12–61–701, 5B C.R.S. (1991). The federal legislation requires that real estate appraisals "utilized in connection with federally related transactions are performed ... by individuals whose compe-

tency has been demonstrated." 12 U.S.C. § 3331 (1994 Supp.). County assessors are not involved in "federally related transactions."

**3.** Reale sought review of the trial court's order by filing a petition for an original proceeding or, in the alternative, a writ of certiorari and motion to stay with this court. We granted Reale's petition for writ of certiorari pursuant to C.A.R. 50 and issued a stay.

*bility to Constitutional Offices,* 34 A.L.R.2d 155, 171 (1965) (hereinafter referred to as *Legislative Power to Prescribe Qualifications* ); 63A Am.Jur.2d, *Public Officers and Employees* § 37 (1984) ("The general rule is that where the Constitution establishes specific eligibility requirements for a particular constitutional office, the constitutional criteria are exclusive.").

The rationale for the rule is expressed by the maxim, "expressio unius est exclusio alterius"—the expression of one thing is the exclusion of another. *Cornell,* 249 P. at 960.

> The qualifications fixed in the Constitution are exclusive for the reason that if it were not intended by the framers thereof to fix all the qualifications, then it must have been intended to fix only a part and leave it to the legislature to fix others. Such a view is inconsistent with accepted constitutional construction that the enumeration of certain specified things in a. Constitution will usually be construed to exclude all other things not so enumerated.

*Whitney,* 330 P.2d at 1005.

While the text of the constitution, rules of constitutional construction, and the prece-dents of this court all support the adoption of the majority rule, *see infra* pp. 1208, it is important to recognize that this rule is grounded, ultimately, on unassailable principles of democratic governance. If the qualifications set out in Article XIV, section 10 for the office of county assessor can only be read as establishing a minimum requirement, and not as a limitation on the imposition of additional qualifications by the General Assembly then there can be no doubt that the General Assembly would have the power to add qualifications for other constitutional offices.[4] For example, the legislature could require that a governor obtain a degree in government by completing a prescribed course in an accredited university within one year after taking office, or that a justice take courses in jurisprudence for certification within a certain time frame. The legislature could also make obtaining a certificate by completing a minimum number of hours of classroom instruction and passing a standardized legislator's examination within six months after taking office a requisite for representatives and senators.[5]

As such, the most fundamental right reserved to the people—the right to vote for

---

**4.** The language employed by the framers of the Colorado Constitution to state the requisite qualifications for other constitutional offices precisely mirrors that used in article XIV, section 10 for the position of county assessor.

Colo. Const. art. VI, § 8 provides for the qualifications of justices and states, "[n]o person shall be eligible to the office of justice of the supreme court unless he shall. . . ." Likewise, in describing the qualifications for district judges, Colo. Const. art. VI, § 11 provides "[n]o person shall be eligible to the office of district judge unless he shall. . . ." *The qualifications enunciated for district judges similarly apply to both probate judges and juvenile judges. Colo. Const. art. VI, §§ 14–15.*

Qualifications for the positions of governor and attorney general are stated in Colo. Const. art. IV, § 4 which provides "[n]o person shall be eligible to the office of governor . . . unless he shall . . . nor to the office of attorney general unless he shall. . . ."

Similarly, Colo. Const. art. V, § 4, relating the qualifications for legislators states "[n]o person shall be a representative or senator who shall not have. . . ."

**5.** Granting the legislative branch the unchecked ability to prescribe qualifications for elected constitutional officers tips the delicate balance of powers which underlies our constitution. Article III of the Colorado Constitution provides "[t]he powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." This court has stated "[t]he fundamental meaning of the separation of powers doctrine is that the three branches of government are separate, coordinate, and *equal* . . . . [and] 'these principles, concepts, and doctrines are so thoroughly embedded in our legal system that they have become bone and sinew of our state and national polity.' " *Pena v. District Court,* 681 P.2d 953, 956–57 (Colo.1984) (emphasis added) (quoting *Smith v. Miller,* 153 Colo. 35, 40–41, 384 P.2d 738, 741 (1963)). *See also People ex rel. Walker v. Capp,* 61 Colo. 396, 158 P. 143 (1916) (explaining when the constitution creates an office or provides that the Governor appoint an executive official "it may be conceded that the Governor's discretion could not be interfered with by the legislature.") *Id.* at 398, 158 P. at 144. We cannot subscribe to a legislative practice that allows one branch of the government to limit constitutionally established "executive" offices and thus to do indirectly that which they are prohibited from doing directly.

representatives of their choice—would hinge not on constitutional guarantees, but on the General Assembly's willingness to abstain from imposing additional qualifications for holding constitutional offices.

> [I]f the legislature possesses the power to vary the constitutional qualifications for office by adding new requirements or imposing additional limitations, then eligibility to office and freedom of elections depend, not upon constitutional guarantees, but upon legislative forbearance. If the legislature may alter the constitutional requirements, its power is then unlimited, and only such person may be elected to office as the legislature may permit.... [W]hen the Constitution undertakes to prescribe qualifications for office, its declaration is conclusive of the whole matter, whether in affirmative or negative form.

*McCormick,* 103 N.E. at 1057.

In a constitutional democracy the principle that the people must be permitted to vote for candidates of their choosing and in conformity with constitutional mandates is beyond question. Indeed, this principle is one of the primary features which distinguishes a constitutional democracy from other forms of government. That the right of the people to choose their representatives could hinge not on constitutional guarantees but on the predilections of the legislature, no matter how well-intentioned, is contrary to this elemental postulate of democratic government.

### B

Keeping this justification for the majority rule in mind, we turn to the provisions of the Colorado Constitution. *See Legislative Power to Prescribe Qualifications* at 155 ("the question of whether a given state legislature has power to prescribe eligibility qualifications for a constitutional office depends, essentially, upon the relevant content of the state constitution").

■ The Colorado Constitution, unlike the federal constitution, does not comprise a grant of but rather, a limitation on power. All power which is not limited by the constitution is vested in the people and may be

exercised by them via their elected representatives so long as the constitution contains no prohibition against it. *Colorado State Civil Serv. Employee Ass'n v. Love,* 167 Colo. 436, 448 P.2d 624 (1968). This principle supports the conclusion that the legislature does not have the power to impose additional qualifications for holding the office of county assessor.

Article XIV, section 10 requires only that a person be a qualified elector and have resided in the county one year prior to the election. The fact that the framers of the state constitution chose to specify the qualifications for this office limits, by implication, the legislature's power to impose additional qualifications. *See Thomas v. State,* 58 So.2d 173, 177 (Fla.1952). Recognizing that the Colorado Constitution is a limitation on the power of the legislative branch supports, rather than contradicts, the conclusion that the General Assembly does not have the power to impose additional qualifications for holding the office of county assessor.

■ Second, it is significant to note that of the many constitutional provisions prescribing qualifications for constitutional offices, only those for county judges, school superintendents, and county attorneys specifically provide that the legislature has discretion to establish additional qualifications for those offices. Colo. Const. art. VI, § 16; Colo. Const. art. IX, § 6; Colo. Const. art. XIV, § 8. To conclude that the legislature's plenary power vests it with the ability to add qualifications for all constitutionally created offices would render the above provisions redundant. Because we presume that each phrase of the constitution was included for a purpose, *Colorado State Civil Serv. Employee Ass'n v. Love,* 167 Colo. 436, 447, 448 P.2d 624, 628 (1968), the most reasonable conclusion to be drawn from these provisions is that the constitution only authorizes legislatively adopted qualifications where specifically allowed.

Third, we conclude that our precedent, rather than conflicting with the majority rule as the Board argues, actually supports it. For instance, in *Yenter v. Baker,* 126 Colo. 232, 248 P.2d 311 (1952), we considered whether a statute that provided that initia-

tive petitions must be filed "at least eight months" before election violated article V of the Colorado Constitution, which provided that such petitions must be filed "at least four months" before the election. The plaintiff in *Yenter* argued that the four month constitutional requirement did not establish a minimum requirement which would always permit filing any time not less than four months prior to the election, but permitted the legislature to increase the minimum time requirement beyond the constitutionally mandated minimum.

In holding that where "the Constitution ... sets a limitation, the legislature may not make any other limitation than those provided in the Constitution," *id.* at 241, 248 P.2d at 316, we relied on *People v. McCormick,* 261 Ill. 413, 103 N.E. 1053 (1913). In *McCormick,* the Illinois Supreme Court considered whether the legislature could increase the residency requirements beyond that set forth in the Illinois Constitution, which provided that no person shall be elected to any office "who shall not have resided in this state one year next preceding the election." *Id.* 103 N.E. at 1056. The court ruled that, where the constitution declares the qualifications for office, they are exclusive and it is not within the power of the legislature to change or add to them. *Id.* The holding of *Yenter* supports the general rule that constitutionally imposed requirements for holding constitutional offices are exclusive.[6]

Thus, we conclude that the qualifications for the office of county assessor are fixed by the constitution and that the imposition of additional qualifications by the General Assembly is prohibited.

### C

▇ We reject the rule adopted by some courts which have held that negatively

phrased qualifications for specific offices do not imply that those qualifications are exclusive, but set only minimum requirements that may be supplemented by the legislature. *See, e.g., Boughton v. Price,* 70 Idaho 243, 215 P.2d 286 (1950). In our judgment, to embrace the rule of *Boughton* requires rejection of the "accepted [principle of] constitutional construction that the enumeration of certain specified things in a constitution will usually be construed to exclude all other things not so enumerated." *Whitney v. Bolin,* 85 Ariz. 44, 330 P.2d 1003, 1005 (1958). *See also* 1 J. Story, *Commentaries on the Constitution of the United States* § 625, 461 (1891) ("It would seem but fair reasoning, upon the plainest principles of interpretation, that when the Constitution established certain qualifications as necessary for office, it meant to exclude all others as prerequisites."). The rationale for this rule was well stated by the Arkansas Supreme Court:

> The qualifications fixed by the constitution to be county judge in this state inferentially prohibit the legislature from fixing additional qualifications. Why fix them in the first place if the makers of the constitution did not intend to fix all the qualifications required, and why fix only a part of them and leave it to the legislature to fix other qualifications? There is no reasonable answer to these questions. The makers of the constitution knew exactly what qualifications a county judge should have and fixed them, and of course, fixed all of them and not a part of them. The makers of the constitution intended to cover the whole subject of the qualifications for a county judge. Had the makers of the constitution intended otherwise they would have created the office of the county judge with direction to the legislature to fix their qualifications.

6. In addition, we note that in 1981, Colorado Attorney General J.D. MacFarlane issued an opinion as to whether the legislature could add qualifications for the constitutionally created office of county coroner. The Attorney General concluded that the legislature could not impose additional requirements on the office based on the majority rule: "Because the office of county coroner is created by the Constitution and qualifications for holding office are specified in the Constitution, it is my opinion that the legislature

cannot add to those qualifications by adopting experience and training requirements for that office." Op.Atty.Gen. No. CAG/AGA/AGAFP/MIC (Feb. 9, 1981). The qualifications cited in the Attorney General's opinion are the same qualifications applicable to county assessors. *See* Colo. Const. art. XIV, § 10. The Attorney General's opinion that the majority rule applies to offices created by the Colorado Constitution supports our view. *See Colorado Ass'n of Public Employees v. Lamm,* 677 P.2d 1350, 1360 (Colo.1984).

*Mississippi County v. Green,* 200 Ark. 204, 138 S.W.2d 377, 379 (1940).

This reasoning is particularly persuasive as applied to the Colorado Constitution given the fact that the framers *did* express their intent to permit the legislature to fix additional qualifications for certain offices, but declined to so provide for the office of county assessor. *See supra* pp. 1208–1209.[7] Consequently, we conclude that the negative phrasing of article XIV, section 10 is immaterial to determining whether the qualifications contained therein are exclusive. *See, e.g., Whitney,* 330 P.2d at 1005 ("We conclude that any distinction between the statement of the constitutional qualification in the negative as opposed to the affirmative is so tenuous that there is no reasonable basis for its existence."); *Chambers v. Terry,* 40 Cal.App.2d 153, 104 P.2d 663, 666 (1940) (negative phrasing immaterial to whether provision sets forth exclusive qualifications for constitutional office); *McCormick,* 103 N.E. at 1057 (same). *See also State v. Welch,* 198 Or. 670, 259 P.2d 112, 115 (1953) (rejecting the rule of *Boughton* and concluding that all of the cases applying that rule were inapposite because they either involved offices that were not created by the constitution or involved constitutional offices for which no qualifications were prescribed).[8]

The Board, while conceding that the weight of authority is in accordance with the majority rule, argues that for a number of reasons Colorado should reject that rule. First, it contends the rule that general re-

quirements set forth in the constitution are not exclusive for holding a constitutionally created office is supported by the precedent of this court. In support of this contention, the Board cites *Darrow v. People,* 8 Colo. 417, 8 P. 661 (1885). In *Darrow,* the plaintiff argued that he was unlawfully disqualified from holding the office of alderman of the city of Denver. His disqualification was based on his failure to pay taxes in Denver during the year prior to his election—a requirement imposed by the legislature as a prerequisite to holding the office of city alderman.

*Darrow* is clearly distinguishable from the present case because the office of alderman is a legislatively, not constitutionally created office. *Id.* at 421, 8 P. at 664. This distinction is critical because, as a general rule, a legislative body has expansive power over offices created by it:

> There is a distinction between offices created by the Constitution and those created by statute. Where an office is created by statute, it is wholly within the power of the Legislature creating it. The length of term and mode of appointment may be altered at pleasure, and the office may be abolished altogether. . . . It is not so of constitutional offices.

*McCormick,* 103 N.E. at 1057. *See also Legislative Power to Prescribe Qualifications* at 168. *Darrow* is not controlling here.

The Board also argues that the settled practice of the General Assembly indicates

---

7. This conclusion also finds support in the proceedings of the constitutional convention. After the work of the Colorado Constitutional convention was completed, a committee of that body was appointed to prepare an address to the people, informing them of the main features of the instrument framed for their adoption or rejection. *In Re: Lowrie,* 8 Colo. 499, 9 P. 489 (1885). The address is an authentic memorial of the time. *People v. May,* 9 Colo. 80, 10 P. 641 (1885). With regard to eligibility to hold state and county offices, the address stated: "We have declared that all persons who are qualified electors at the adoption of the Constitution, shall be eligible to the several state offices, to the general assembly, and to the various county offices." Address to the People, *Proceedings of the Constitutional Convention,* 1875–1876, p. 731 (1907). In our opinion, this declaration supports the contention that the framers placed no signifi-

cance on the negative phrasing of art. XIV, § 10. The characterization of that section is itself in positive form and unconditionally extends eligibility to office to all qualified electors.

8. As previously described in footnote four, the language employed by the framers to state the requisite qualifications for other constitutional offices precisely mirrors that used in article XIV, section 10 for the position of county assessor.

Thus, if negative phrasing is dispositive of the authority of the legislature to prescribe additional qualifications for county assessor, its power would extend to qualifications for governor, judicial offices and the legislature itself. The legislature would effectively control who could hold these offices, dramatically curtailing the most fundamental right reserved to the people, the right to have persons they elect remain in office.

that the constitutional requirements are not exclusive. It points out that numerous requirements for office have been imposed by the legislature on other constitutionally created offices. The short response to this argument is, of course, that prior unconstitutional enactments do not justify later ones.

■ Giving the argument more credit than perhaps it is due, it is significant to note that most of the requirements cited by the Board are not analogous to those at issue here. To the contrary, the majority of the requirements cited to by the Board are bond and oath requirements. Bond and oath requirements traditionally are not considered qualifications for eligibility to office, but rather requirements necessary to "qualify" to take office under provisions such as article XII, section 10 of the Colorado Constitution. *See, e.g., State v. Ellis,* 110 Mont. 43, 98 P.2d 879, 881–82 (1940) ("To 'qualify' means to file an official bond and oath.... [T]he qualifications which must ... be present at the time of election, are limited to age and residence"); *Legislative Power to Prescribe Qualifications* at 162 (qualifications "are primarily those laid down as prerequisites to election or appointment to a constitutional office, and may generally be distinguished from requirements relating to 'qualifications' to serve in an office to which one has been elected or appointed, such as a requirement that an electee or appointee must 'qualify' by giving a certain bond or by taking an oath of office").

Consequently, we conclude that none of the reasons advanced by the Board are persuasive.

## III

The Colorado Constitution reserves no authority in the state legislature to change, add to, or diminish the qualifications for constitutionally created offices. Accordingly, we hold that the licensing requirements of the Act as applied to county assessors are unconstitutional and that Reale cannot be enjoined from holding the office of Adams County Assessor.

The judgment is reversed and the case remanded to the trial court with directions to dismiss the complaint.

Justice ERICKSON dissenting:

I respectfully dissent. This is an original proceeding filed pursuant to C.A.R. 21 that was alternatively styled as a petition for certiorari. The district court for Adams County permanently enjoined Pat Reale (Reale) from continuing to hold the office of Adams County Assessor. We elected to treat the original proceeding as a petition for certiorari before judgment under C.A.R. 50. I would affirm the district court's permanent injunction.

The district judge made the following factual and legal determinations:

The office of county assessor is responsible for the listing and valuation of all real property located in the county. The duties of the office include the separate appraisal of each tract or parcel of land in the county. C.R.S. 39–5–104. Each county assessor is responsible for preparing and certifying an annual Abstract of Assessment cataloging all taxable property and a Certificate of Value which is submitted to each taxing authority in the county showing the total valuation for assessment of property within the territorial limits of the taxing district. C.R.S. 39–5–128. Thus, the basic and primary responsibility of a county assessor necessarily involves the appraisal of real property.

In 1990, the Colorado General Assembly enacted C.R.S. 12–61–701, et seq., dealing with the licensure of real estate appraisers. This law was substantially amended in 1992. Section 12–61–702(1) defines an appraisal as including any valuation completed by a county assessor or any appraiser employee of any such assessor. Section 12–61–702(5) in pertinent part defines a real estate appraiser as being any person who provides, for a salary, an estimate of the value of an interest in identified real estate.

As part of the legislative enactment, C.R.S. 12–61–706 establishes four levels of licensure. These are registered appraiser, licensed appraiser, certified residential appraiser and certified general appraiser. A

person seeking to become a registered appraiser must have had at least fifty-five classroom hours of appraisal education and shall have passed an examination given by the plaintiff board. Each of the next three levels of licensure require progressively more education and/or experience together with the passing of an examination administered by the board. Section 12–61–714(2) requires that a county assessor shall have obtained some level of licensure by July 1, 1993 or one year after taking office.

The petitioner, Reale, is the duly elected Adams County Assessor and has served in that capacity for many years. The Colorado Board of Real Estate Appraisers (Board) is charged with the responsibility of enforcing the Real Estate Appraisers Act (Act). §§ 12–61–701 to –717, 5B C.R.S. (1991). Accordingly, the Board sought an injunction against Reale in the Adams County District Court[1] pursuant to section 12–61–713, 5B C.R.S. (1991). Pat Reale was the only county assessor in Colorado's sixty-three counties who refused and failed to comply with section 12–61–706(4)(a). As county assessor, Reale was compelled to sign an Abstract of Assessment, which the Board alleges and the district court found, could not be signed by an assessor who was not a registered appraiser. The district court entered a permanent injunction after a full hearing and enjoined Reale from continuing to hold office as the County Assessor of Adams County. The validity of that injunction is now before us.

1. The relevant provisions are:

**§ 12–61–706, 5B C.R.S. (1991). Qualifications for appraiser's license and certification— continuing education.** (1) A person applying for an appraiser's license shall apply in such form and manner as prescribed by the board. Applicants shall have had at least fifty-five clock hours of appraisal education and training or the substantial equivalent thereof as approved by the board, and shall pass an examination developed or purchased by the board....

....

(4)(a) Subject to the provisions of section 12–61–714(2), all persons holding the office of county assessor shall become licensed as provided in this subsection (4). A person applying for an appraiser's license as a county assessor as defined in section 39–1–102(2), C.R.S., or an appraiser employee of any such assessor shall apply in such form and manner as pre-

## I

The majority acknowledges that, "the question of whether a given state legislature has power to prescribe eligibility qualifications for a constitutional office depends, essentially, upon the relevant content of the State Constitution." C.T. Foster, Annotation, *Legislative Power to Prescribe Qualifications for or Consideration of Eligibility to Constitutional Offices*, 34 A.L.R.2d 155 (1965). The relevant provisions of the Colorado Constitution do not foreclose the General Assembly from imposing additional qualifications for the office of county assessor.

All of the powers granted to the federal government were set forth in the United States Constitution when it was adopted. All powers in Colorado are reserved to the people when not limited by the Colorado Constitution. The power vested in the people of Colorado is exercised by the people's elected representatives. *District Landowners Trust v. Adams County*, 104 Colo. 146, 89 P.2d 251 (1939).[2] The General Assembly, as the representatives of the people, may enact legislation that reaches any reasonable governmental end and does not conflict with the Colorado Constitution. In *People ex rel. Rhodes v. Fleming*, 10 Colo. 553, 559, 16 P. 298, 301 (1887), we said:

[W]e look to the constitution, not for a grant of the power, but to ascertain wheth-

scribed by the board. Applicants shall have had at least fifty-five clock hours of education and training as approved by the board, and shall pass an examination developed or purchased by the board except as otherwise provided in subsection (5) of this section for the initial examination pursuant to this section. An applicant who complies with the requirements of this subsection (4) shall be issued a license and may perform all of the duties required of such a county assessor or employee thereof; except that an appraiser licensed under the requirements of this subsection (4) shall appraise only that real estate constituting the official duties of a county assessor or an employee of such assessor.

2. The General Assembly is limited by the Colorado Constitution. *Colorado State Civil Service Employees Ass'n v. Love*, 167 Colo. 436, 448 P.2d 624 (1968); *People ex rel. Rhodes v. Fleming*, 10 Colo. 553, 16 P. 298 (1887).

er the exercise of such power is prohibited; and, if it is not prohibited, the act is valid.

Article XIV, section 8 of the Colorado Constitution creates the office of county assessor, and a number of other county offices. Section 8 also grants discretion to the General Assembly to determine the fund from which an assessor is paid and the time when the assessor takes office.[3] The plain wording of section 8 encourages rather than inhibits the exercise of the power to set forth qualifications for a county assessor.

The majority finds an implied limitation upon the General Assembly's power based upon the doctrine of "expressio unius est exclusio alterius" (the inclusion of one thing is the exclusion of another).[4] The analysis based upon the doctrine is flawed. The doctrine of "expressio unius est exclusio alterius" is inapt when the constitution limits, rather than grants, power. When a constitution grants authority, no more than what is specifically enumerated is granted. *Cornell v. McAllister*, 121 Okla. 285, 249 P. 959 (1926). Conversely, when a constitution limits power, all powers not specifically limited are presumptively retained by the people's representatives. *District Landowners Trust*, 104 Colo. at 150, 89 P.2d at 253 (1939). The Colorado Constitution preserves the power of the people to act through their elected representatives in the General Assembly in the absence of an express or implied constitutional limitation.

Article XIV, section 10 is the only section in the Colorado Constitution that addresses qualifications for county offices, including the county assessor, and provides that "No person shall be eligible to any county office unless he shall be a qualified elector; nor unless he shall have resided in the county one year preceding his election." As interpreted by the majority, the General Assembly is limited by the plain language of article XIV, section 10. The qualifications as to residency and for qualified elector status are also applicable to sheriffs, coroners, and other county offices created by section 8 of article XIV.[5] The qualifications within section 10 can only be read as establishing a minimum requirement, and not as a limitation on the imposition of additional qualifications by the General Assembly.

As applied to the Colorado Constitution "expressio unius est exclusio alterius" does not reflect constitutional intent. The implication drawn from the doctrine is misleading. Where the Colorado Constitution seeks to strip the General Assembly of power, it states that the "General Assembly shall have no power."[6] If the framers of the constitution sought to limit legislative discretion in this instance, they would not have depended

---

3. Art. XIV, § 8 states:

> **Section 8. County officers—election—term—salary.** There shall be elected in each county, at the same time at which members of the general assembly are elected, commencing in the year nineteen hundred and fifty-four, and every four years thereafter, one county clerk, who shall be ex officio recorder of deeds and clerk of the board of county commissioners; one sheriff; one coroner; one treasurer who shall be collector of taxes; one county superintendent of schools; one county surveyor; *one county assessor;* and one county attorney who may be elected or appointed, as shall be provided by law; and such officers shall be paid such salary or compensation, either from the fees, perquisites and emoluments of their respective offices, or from the general county fund, as may be provided by law. The term of office of all such officials shall be four years, and they shall take office on the second Tuesday in January next following their election, or at such other time as may be provided by law. The officers herein named elected at the gener-

al election in 1954 shall hold their respective offices until the second Tuesday of January, 1959 (emphasis added).

4. The majority also seeks to apply the same doctrine to statements from the Constitutional Convention of Colorado. Maj. op. at 1210. What the constitution did or does say is not sufficient to establish a limitation if "[t]here is nothing therein to indicate that the convention ... intended to limit the power of the legislature to prescribe additional qualifications." *Boughton v. Price*, 70 Idaho 243, 215 P.2d 286, 290 (1950).

5. The majority opinion raises questions as to the constitutionality of the statutes which require a sheriff to undergo peace officer training and for coroners to possess adequate legal and medical knowledge. § 30–10–501.5, 12A C.R.S. (1986); § 30–10–601, 12A C.R.S. (1986).

6. Colo. Const. art. VIII, § 2; Colo. Const. art. XIV, § 2; Colo. Const. art. XVIII, § 2; Colo. Const. art. XIX, § 2.

upon implication but would have set forth an express limitation.[7]

## II

This court addressed concerns relevant to this case in *Alexander v. People,* 7 Colo. 155, 2 P. 894 (1883). In *Alexander,* Article XIV, section 2 of the Colorado Constitution provided that "no county seat shall be removed unless a majority of the qualified electors of the county ... vote therefor." *Alexander* at 157, 2 P. at 894. A subsequent act by the General Assembly declared that "not less than two-thirds of all the legal votes cast shall be necessary to effect the removal of the county seat of any county in this state." *Id.*

In upholding the statute, *Alexander* held that "[l]egal presumptions are in favor of the integrity and wisdom of legislators, as well as the validity of their enactments." *Id.* at 166, 2 P. at 900. We must presume such validity until a constitutional conflict is shown beyond a reasonable doubt. *Id.; see Ogden v. Saunders,* 25 U.S. (12 Wheat.) 213, 6 L.Ed. 606 (1827).[8]

*Yenter v. Baker,* 126 Colo. 232, 248 P.2d 311 (1952), also supports a finding that the General Assembly may impose additional qualifications upon constitutionally-created offices. The court in *Yenter* held that where "the Constitution as part of a self-executing provision sets a limitation, the legislature may not make any other limitation than that provided in the Constitution." *Id.* at 241, 248 P.2d at 316. The provisions at issue in this case cannot be considered "self-executing", especially in light of the numerous pieces of ancillary legislation passed to supplement them. *See* n. 11; *see also Black's Law Dic-*

tionary 1220 (5th ed. 1979) (defining "self-execution constitutional provision": "[c]onstitutional provision is not 'self-executing' when it merely indicates principles without laying down rules giving them force of law").

## III

A legislature may impose additional qualifications for constitutional offices if the constitutional provision is general and stated in the negative. Both article VII, section 6, and Article XIV, section 10 are stated in the negative and limit the elected office by commencing with the statement "No person shall be eligible." The negative construction creates grounds for disqualification, but leaves the legislature free to impose additional qualifications. *See Legislative Power to Prescribe Qualifications,* 34 A.L.R. at 167.

In *Darrow v. People,* 8 Colo. 417, 8 P. 661 (1885), the court upheld the imposition of additional statutory requirements beyond the Colorado constitutional mandate that "no person, except a qualified elector, shall be elected or appointed to any civil or military office in the state." Colo. Const. art. VII, § 6. *Darrow* held that the General Assembly was not precluded from enacting legislation that required payment of taxes as a qualification for being an alderman in Denver and said:

> But it will be observed that the language used is negative in form; that it simply prohibits the election or appointment to office of one *not* a qualified elector ... other qualifications are absolutely essential to the efficient performance of the duties connected with almost every office. And certainly no doubtful implication should be favored for the purpose of denying the

---

7. The Illinois Supreme Court reasoned that:
   > If the framers of the Constitution had intended to take away from the Legislature the power to name disqualifications for office, other than the one named in the Constitution, it would not have been left to the very doubtful implication which is claimed from the provision under consideration.

   *People v. McCormick,* 261 Ill. 413, 103 N.E. 1053, 1057 (1913) (*quoting State v. Covington,* 29 Ohio St. 102, 118 (1876)).

8. The court also said that "[w]hen the lowest limit only is fixed in the fundamental law, the legislature may act without restraint in the ascending scale, as we have before stated, and having fixed in the statute the vote which shall be required, it becomes the paramount law, and nothing is left for implication." *Alexander* at 165, 2 P. at 899.

right to demand such additional qualifications as the nature of the particular office may reasonably require. We do not believe that the framers of the constitution, by this provision, intended to say that the right to vote should be the sole and exclusive test of eligibility to all civil offices, except as otherwise provided in the instrument itself; that no additional qualifications should ever be demanded, and no other disqualifications should be imposed.

*Id.* at 420–21, 8 P. at 663–64.[9]

The majority also cites *Boughton v. Price,* 70 Idaho 243, 215 P.2d 286 (1950). In *Boughton,* the constitutional requirements for district court judge did not bar seventy-year-old candidates from seeking the office but an Idaho statute did. The Idaho Supreme Court, in upholding the statute, said:

[W]here the constitution *affirmatively* and *clearly* prescribes the qualifications for eligibility for a constitutional office, it is not within the power of the legislature to change, add to or take from such qualifications unless granted such power by the constitution.

. . . .

[W]here the constitution has imposed some qualifications, *particularly in negative* form, upon the constitutional officers, but not exclusive ones, the legislature may add such others as are reasonable and proper and not in conflict with the constitutional provisions: *Glasco v. State Election Board,* 121 Okla. 119, 248 P. 642 [ (1926) ]; *State ex rel. Hartford v. Craig,* 132 Ind. 54, 31 N.E. 352, 16 L.R.A. 688, 32 Am.St.Rep. 237 [ (1892) ]; *Throop on Public Officers,* p. 82;

*Mechon on Public Officers,* Section 66, pp. 22–23; *State ex rel. Workman v. Goldthait,* [172 Ind. 210, 87 N.E. 133, 19 Ann.Cas. 737 (1909) ], and authorities cited therein; *Fordyce v. State,* [115 Wis. 608, 92 N.W. 430 (1902) ]; *State ex rel. Attorney General v. Covington,* 29 Ohio St. 102 [ (1876) ]; *Darrow v. People,* 8 Colo. 417, 8 P. 661 [ (1885) ]; *State ex rel. Thompson v. McAllister,* 38 W.Va. 485, 18 S.E. 770, 24 L.R.A. 343 [ (1893) ].

*Id.* 215 P.2d at 289, 290 (emphasis added).

The New Mexico Supreme Court reached a similar conclusion on similar grounds in *Gibbany v. Ford,* 29 N.M. 621, 225 P. 577 (1924):

[T]he Legislature has no power to add restrictions upon the right to hold office beyond those provided in the Constitution, because the constitutional provision is not a *negative* one providing that no person shall be eligible to hold an office unless he possess certain qualifications, as is often the case in other states, but is a *positive* provision, giving the right to every person possessing the qualifications therein set forth to hold office. . . .

*Id.* 225 P. at 578 (emphasis added).

## IV

The qualifications established by the Act ensure that an assessor can adequately perform his job. The legislation was enacted pursuant to a request by the Board of Real Estate Appraisers and supplements Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989. 12 U.S.C.

---

9. The General Assembly, in reliance on *Darrow,* has enacted several statutes that establish qualifications to hold particular constitutionally-specified offices. *See, e.g.,* § 30–10–501.5, 12A C.R.S. (1986) (requiring United States citizenship, a high school diploma or college degree, peace officer certification, and one hundred hours of designated training for sheriffs); § 30–10–601, 12A C.R.S. (1986 & 1994 Supp.) (expressing intent to require coroner participation in designated programs); § 30–10–901, 12A C.R.S. (1986) (requiring county surveyors to be professional land surveyors); § 30–10–706, 12A C.R.S. (1986) (disqualifying certain state officers from holding

the office of county treasurer); § 12–61–714, 5B C.R.S. (1991) (requiring the licensure or certification of all acting appraisers).

The General Assembly has also enacted bond and oath requirements for a number of offices specified by the Constitution. *See, e.g.,* § 30–10–110, 12A C.R.S. (1986) (county officers); § 30–10–401, 12A C.R.S. (1986) (county clerk); §§ 30–10–501 & –502, 12A C.R.S. (1986) (sheriff); § 30–10–701, 12A C.R.S. (1986) (treasurer); § 30–10–801, 12A C.R.S. (1986) (assessor).

§ 3331 (1989). The statute requires assessors to obtain sufficient formal education to perform a real estate appraisal, something "inherently ... and inseparably connected with the county assessor's duties." [10]    As found by the trial court, "the basic and primary responsibility of a county assessor necessarily involves the appraisal of real property." The valuation of property affects every taxpayer within the county. Legislation which requires an assessor to possess the skills necessary to carry out this duty is closely tied to the need addressed.

Because there is a sufficient "nexus ... between the office of assessor and the need to verify the skills ... by an examination," the additional qualifications are reasonable. *See Landis v. Ward,* 117 Fla. 585, 158 So. 273 (1934) (holding valid a statute requiring county surveyors to be registered); *State ex rel. Hehr v. Berry,* 55 Ohio App. 243, 9 N.E.2d 699 (Ohio App.1936) (holding valid a requirement that county engineers be registered professional engineers or licensed registered surveyors); *see also People ex rel. Odell v. Flaningam,* 347 Ill. 328, 179 N.E. 823 (1932) (holding valid a requirement that superintendent of school hold a certain kind of teaching certificate); *Jansky v. Baldwin,* 120 Kan. 332, 243 P. 302 (1926) (same).

I would therefore affirm the district court and uphold the permanent injunction prohibiting Reale from continuing to serve as the Adams County Assessor.

---

**10.** Reale claims that he acts as an "ombudsman" and "administrator," and does not perform any actual appraisals or assessments. However, the signing of an Abstract of Assessment (an evaluation of the appraisal), is a non-delegable duty that must be performed by the county assessor. Therefore, the Adams County Assessor is expected to have the qualifications to evaluate the appraisals of real property in the county.